DEBORAH LEA NELSON, NOW KNOWN AS DEBORAH LEA NECHKASH,
APPELLANT, V. TERRY ALAN NELSON, APPELLEE, AND
ARLENE NELSON, PATERNAL GRANDMOTHER, AND
JACQUELINE M. MCKERN AND HERBERT M. MCKERN,
MATERNAL GRANDPARENTS, INTERVENORS-APPELLEES.

674 N.W.2d 473

Filed February 6, 2004.   Nos. S-02-252, S-02-512.

Andrew C. Sigerson, of Blazek & Associates, P.C., L.L.O., for appellant.

Michael B. Lustgarten and Matthew A. Headley, Senior Certified Law Student, of Lustgarten & Roberts, P.C., for intervenor-appellee Arlene Nelson.

Diane L. Berger for intervenors-appellees Jacqueline M. McKern and Herbert M. McKern.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Deborah Lea Nelson, now known as Deborah Lea Nechkash, appealed from an order of the district court for Douglas County

granting two separate petitions for grandparent visitation and from a subsequent order holding her in contempt for violation of the visitation order. The Nebraska Court of Appeals determined that the district court abused its discretion in ordering visitation and reversed, and remanded with directions to dismiss. The court also dismissed the appeal from the contempt order as moot. *Nelson v. Nelson*, Nos. A-02-252, A-02-512, 2003 WL 1798939 (Neb. App. Apr. 8, 2003) (not designated for permanent publication). We granted the grandparents' petition for further review.

## BACKGROUND

The following detailed summary of the testimony and procedural background of these cases is adopted substantially, and for the most part verbatim, from the opinion of the Court of Appeals.

A decree dissolving the marriage of Deborah and Terry Alan Nelson was entered in August 2001. Terry died a few weeks later. Deborah was awarded custody of their three children: Erica Brooke Nelson, born June 14, 1990; Alan James Nelson, born April 23, 1992, and Cullan Justin Nelson, born May 17, 1994. Deborah remarried on December 7, 2001.

Arlene Nelson, a widow, is the children's paternal grandmother, and Jacqueline M. McKern and Herbert M. McKern are the maternal grandparents. They filed separate petitions to intervene in the dissolution action, which petitions were granted. Arlene filed a petition for visitation on December 19, 2001, and the McKerns filed a similar petition on January 2, 2002. Deborah answered with general denials. A trial on both petitions was held on January 16.

Arlene testified that prior to her husband's death in 1993, Deborah, Terry, and the children came to Arlene's house "more than twice a week" and that she and her husband took them out to eat on "almost a weekly basis." There were also times during this period when the children spent the night with Arlene and her husband. After her husband's death and until approximately 3 years prior to the trial, Arlene saw the children on at least a weekly basis when she became their daycare provider. Arlene testified that she performed the following services in her role as daycare provider:

[T]hree years ago, I went over on a daily basis to [Deborah and Terry's] home and — I got over there about 6:15 in the morning and I did — I cleaned the kitchen and picked up everything, got the kids breakfast and took them to school and picked them up. The one was a kindergartner at the time.

During the summer, I did the same thing. I took them to swimming lessons and I picked them up and I took them to my house and watched them on a daily basis. I was their day care provider.

Arlene was the children's daycare provider for approximately 2 years.

Arlene testified that during the 2 years preceding the trial, the children spent the night at her house when Terry exercised his visitation rights and perhaps on a few other "sporadic" occasions. Arlene testified that she has had regular contact with the children since they were born, except for a period when Deborah would not allow the children or Terry to visit Arlene because of a dispute over money.

Arlene requested an order that she and the McKerns be allowed to share visitation with the children either Friday evening to Sunday evening once a month, or Saturday morning to Sunday evening every other weekend. She asked for court-ordered visitation, in part because she believed it would be her only contact with the children and the children's only contact with Terry's side of the family. Arlene testified that Terry's brother, sisters, and cousins no longer have contact with the children because "that's not allowed." Arlene did not have much contact with the McKerns but testified that she had previously involved them in functions at her home relating to the children.

On cross-examination, Arlene read an excerpt from a statement she had written during Deborah and Terry's divorce proceedings. It read:

Deborah Nelson is hard to get along with, destructive family person who cares little about the needs of her own children and/or other people. She wants no church affiliation for herself or her children. A drinker and lazy in all things. Puts herself first and has no family relationships because she has run out of people who will do for her. Manipulative to where she has damaged the lives of her own children. Deborah's

only a biological mother, and has never provided a home atmosphere for the children or her husband. Deborah always had to be in control and center stage. Money is and always has been her goal.

The McKerns, the maternal grandparents, live on a farm near Council Bluffs, Iowa. Jacqueline testified that the children enjoyed visiting the farm and being with the farm animals. Other than a Christmas visit shortly before trial, the McKerns had not seen the children for more than a year. Jacqueline testified that prior to that visit, "there was not much contact at all," because the McKerns "were not talking" to Deborah.

Jacqueline testified that she has five other grandchildren. She feels that it is in the Nelson children's best interests to have ongoing contact with the rest of Deborah's side of the family. Jacqueline testified that Deborah does not have a relationship with any member of their family. While Jacqueline admits there is "some unhappiness between the family," she feels that she is able to be with the children "and not provide any negative feelings" to them.

On cross-examination, Jacqueline admitted that she had not asked Deborah for visitation with the children before seeking court-ordered visitation. After Deborah received notice that Jacqueline had petitioned for visitation rights, Deborah brought the children to see Jacqueline. Jacqueline admitted that on this occasion, she had a brief discussion with Deborah but did not acknowledge the children. On another occasion, in March 2000, Deborah called and asked Jacqueline to watch the children. Jacqueline refused, saying she did not want to be a babysitter. Jacqueline asked the court to award grandparent visitation to be shared with Arlene.

Herbert testified that he made the following statement to Terry at the time of the divorce proceedings:

Will testify that Terry is a better parent for the children. Terry has always worked overtime in the past and provided for the children. Deborah has had no family involvement with either Terry's family or her own family, except for her grandfather who she goes to for money. She has isolated herself from the kids and from family members. She put herself first and will never take responsibility for any

wrongdoing by her. She needs to be in control at all times. Deborah has talked negative[ly] to Terry whenever she was in front of any family members, whether her family or Terry's family.

Deborah testified that she believed it was not in her children's best interests to have contact with their grandparents "at this time" because of the lack of relationship between the children and the grandparents in the past and the grandparents' "negative feelings" toward her and her new husband. She testified that she notices negative changes in her children's behavior after they visit their grandparents and that the children do not look forward to the visits. Deborah testified that she genuinely wishes that visitation were not a "vindictive thing" and that the grandparents actually wanted to see the children. She further stated that "if their motive is the right one and if the kids are in a safe environment and [the grandparents] are not trying to attack me or my husband or the kids, they just want to actually see them, then I would be willing [to allow visitation]."

Deborah characterized her relationship with Arlene as "on/off." Deborah testified that in 1996 and 1997, Arlene had "no relationship" with the children or with her. She stated that there was tension among Arlene, Terry, and herself due to an unrelated legal matter, and that money issues between Arlene and Terry "split them up." Deborah, Terry, and Arlene participated in several counseling sessions which did not succeed in improving their relationship. Deborah does not believe that Arlene had a beneficial relationship with the children during the period that she provided daycare for them. She testified that she ended this arrangement when the children reported that during an argument, Arlene "took a knife out of the drawer and said ['L]et's settle this between you.[']" Arlene did not address this incident in her testimony.

Deborah testified about the visit to the McKerns' home after she learned that they were seeking a visitation order. The visit occurred outside the house. When Deborah asked Jacqueline why she had not called, Jacqueline responded, "I should not have to." Jacqueline then told Deborah that she was "a bitter person" and that she was "not going to argue with [her]" and then walked back into the house. Deborah testified that she has never had a very

good relationship with Herbert. Deborah's breakdown in her relationship with Jacqueline was caused in part because of her belief that she should not have to be the one making the effort to contact the McKerns, that "it should be a mutual relationship."

The district court entered an order establishing grandparent visitation rights on January 30, 2002. It found by clear and convincing evidence that the grandparents had a beneficial relationship with the children, that it was in the best interests of the children that a grandparent-grandchild relationship continue, and that such a relationship would not adversely interfere with the relationship between Deborah and the children. The order granted the following visitation: the first Sunday of each month from 1 to 6 p.m., a 3-hour period on December 24 or 25, a 3-hour period within 2 days before or on each of the children's birthdays, a 3-hour period on the Thanksgiving weekend, and a 3-hour period during the Easter or spring break from school. In addition, the order contained the following provision: "The grandparents shall not make disparaging statements about [Deborah] or her husband to the minor children, or in the presence of the minor children."

Deborah appealed from this order and from a subsequent order finding her in contempt for not complying with the visitation order. The appeals were consolidated in the Court of Appeals. In a 2 to 1 opinion, that court reversed the visitation order and remanded the cause with directions to dismiss. It also dismissed the appeal from the contempt order as moot. *Nelson v. Nelson*, Nos. A-02-252, A-02-512, 2003 WL 1798939 (Neb. App. Apr. 8, 2003) (not designated for permanent publication). The Court of Appeals concluded that while the record reflected a previous relationship between the children and Arlene, "the record contain[ed] no evidence from which it can be inferred that the relationship between Arlene and the children was beneficial to the children." *Id.* at *6. The court further concluded that the McKerns failed to present clear and convincing evidence of a significant relationship with the children, much less a significant beneficial relationship. *Id.*

## ASSIGNMENT OF ERROR

The grandparents assign that the Court of Appeals erred in concluding that the district court abused its discretion in awarding them visitation.

## STANDARD OF REVIEW

■ Determinations concerning grandparent visitation are initially entrusted to the discretion of the trial judge, whose determinations, on appeal, will be reviewed de novo on the record and affirmed in the absence of abuse of the trial judge's discretion. *Pier v. Bolles*, 257 Neb. 120, 596 N.W.2d 1 (1999); *Morris v. Corzatt*, 255 Neb. 182, 583 N.W.2d 26 (1998).

■ A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from action, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Gase v. Gase*, 266 Neb. 975, 671 N.W.2d 223 (2003).

## ANALYSIS

■ At common law, " 'grandparents lacked any legal right to visitation and communication with their grandchildren if such visitation was forbidden by the parents. . . . Indeed, the parents' obligation to allow such visitation was a moral, not a legal obligation.' " *Pier v. Bolles*, 257 Neb. at 124, 596 N.W.2d at 4, quoting *Ex parte Bronstein*, 434 So. 2d 780 (Ala. 1983). In 1986, the Nebraska Legislature enacted the grandparent visitation statutes, 1986 Neb. Laws, L.B. 105, thereby creating a procedure for grandparents to seek court-ordered visitation. See Neb. Rev. Stat. § 43-1801 et seq. (Reissue 1998). Generally, statutes which effect a change in the common law are to be strictly construed. See, *Stoneman v. United Neb. Bank*, 254 Neb. 477, 577 N.W.2d 271 (1998); *Popple v. Rose*, 254 Neb. 1, 573 N.W.2d 765 (1998); *Strauel v. Peterson*, 155 Neb. 448, 52 N.W.2d 307 (1952).

The statute implicated in this case, § 43-1802(2), provides:

In determining whether a grandparent shall be granted visitation, the court shall require evidence concerning the beneficial nature of the relationship of the grandparent to the child. The evidence may be presented by affidavit and shall demonstrate that a significant beneficial relationship exists, or has existed in the past, between the grandparent and the child and that it would be in the best interests of the child to allow such relationship to continue. Reasonable rights of

visitation may be granted when the court determines by clear and convincing evidence that there is, or has been, a significant beneficial relationship between the grandparent and the child, that it is in the best interests of the child that such relationship continues, and that such visitation will not adversely interfere with the parent-child relationship.

The U.S. Supreme Court in *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion), recognized that court-ordered grandparent visitation raises the issue of "perhaps the oldest of the fundamental liberty interests recognized by this Court," the interest of parents in the care, custody, and control of their children. See, *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 1070 (1925) (holding liberty of parents and guardians includes right to direct upbringing and education of children under their control); *Meyer v. Nebraska*, 262 U.S. 390, 43 S. Ct. 625, 67 L. Ed. 1042 (1923) (holding liberty protected by Due Process Clause includes right of parents to establish home, bring up children, and control their education). The *Troxel* plurality held that a Washington grandparent visitation statute was unconstitutional as applied because it violated a fit custodial parent's due process right to make decisions regarding the care, custody, and control of her children by placing the burden on the parent to prove that visitation would not be in the best interests of the children. Although none of the parties in this case frame their arguments in constitutional terms, *Troxel* provides context for our analysis of this conflict between a parent and grandparents over visitation rights.

Nebraska's grandparent visitation statutes clearly and significantly place the burden of proof upon the grandparent seeking a visitation order. Pursuant to § 43-1802(2), a court is without discretionary authority to order grandparent visitation until a petitioning grandparent proves by clear and convincing evidence that "(1) [t]here is, or has been, a significant beneficial relationship between the grandparent and the child; (2) it is in the best interests of the child that such relationship continue; and (3) such visitation will not adversely interfere with the parent-child relationship." *Eberspacher v. Hulme*, 248 Neb. 202, 206, 533 N.W.2d 103, 105 (1995). Clear and convincing evidence means that amount of evidence which produces in the

trier of fact a firm belief or conviction about the existence of a fact to be proved. *State ex rel. Special Counsel for Dis. v. Shapiro*, 266 Neb. 328, 665 N.W.2d 615 (2003); *In re Interest of Michael B. et al.*, 258 Neb. 545, 604 N.W.2d 405 (2000). In the absence of such evidence of the statutory prerequisites set forth in § 43-1802(2), court-ordered grandparent visitation is an abuse of judicial discretion.

We have recognized that any inquiry into the "significant beneficial relationship" requirement of § 43-1802(2) will necessarily be "fact-dependent." *Rosse v. Rosse*, 244 Neb. 967, 973, 510 N.W.2d 73, 78 (1994). We therefore examine the facts of this case in light of this requirement.

Arlene's testimony establishes the nature and frequency of her contacts with the children over the years, but reveals nothing about the nature of the relationship which existed as a result of those contacts. Although she emphasizes her past role as the children's daycare provider, the evidence of this relationship does little more than establish that Arlene performed various housekeeping and transportation chores for the children. There is no testimony or other evidence upon which to base a qualitative assessment of the personal relationship that existed between Arlene and the children during this or any other period. We simply cannot determine from the record whether the relationship between Arlene and the children was congenial or acrimonious, affectionate or indifferent, trusting or deceitful, loving or simply custodial. When asked on direct examination whether she believed the relationship to be beneficial to her and the children, Arlene gave an affirmative response, but no supporting reasons or explanation. While the scant evidentiary record may not reflect the true nature of Arlene's relationship with the children, it is the only evidence we have, and it falls far short of establishing clear and convincing evidence of a significant beneficial relationship. We therefore agree with the Court of Appeals' conclusion that the record "contains no evidence from which it can be inferred that the relationship between Arlene and the children was beneficial to the children. At most, it shows there was contact between Arlene and the children, but the nature of that contact is unknown." *Nelson v. Nelson*, Nos. A-02-252, A-02-512,

2003 WL 1798939 at *6 (Neb. App. Apr. 8, 2003) (not designated for permanent publication).

The evidence concerning the relationship between the McKerns and the children is even more tenuous. The McKerns had "not much contact at all" with the children. Jacqueline described a recent Christmas visit with the children as having gone "very well," but she admits that she did not even acknowledge the children's presence during another recent visit when she and Deborah exchanged harsh words at the doorstep of her home. There is no evidence of affection, kindness, tenderness, or even civility between the McKerns and the children, and we cannot assume the existence of such emotions simply by virtue of the biological relationship. We therefore agree with the conclusion of the Court of Appeals that the McKerns failed to present clear and convincing evidence of a significant beneficial relationship with the children.

As the Court of Appeals correctly noted, the complete failure of proof in this case can be demonstrated by contrasting it with the evidence of the grandparent relationship presented in *Rosse v. Rosse*, 244 Neb. 967, 510 N.W.2d 73 (1994). In *Rosse*, both grandparents offered evidence as to the nature of their personal relationship with their 2½-year-old grandchild, not just the amount of time they spent together. The grandmother testified that she saw her role as " 'loving [her granddaughter] and having her love me.' " *Id.* at 973, 510 N.W.2d at 78. The record reflected that the child lets only the grandmother, whom she calls " 'Nana Therese,' " read to her. *Id.* The grandmother testified that her granddaughter trusts her, tells her that she loves her, and has fallen asleep in her arms. *Id.* The grandfather testified that he plays with his granddaughter, who calls him " 'Grandpa Jack,' " and that they have a good time together. *Id.* at 974, 510 N.W.2d at 78. He also testified that his granddaughter gives him kisses, which he considers a sign of affection. *Id.* Based on this record, and giving due consideration to the age of the child, we determined that there was clear and convincing evidence to support the trial court's finding that a significant beneficial relationship existed between the grandparents and their granddaughter. We cannot reach that conclusion on the record in the instant case.

The grandparents' proof in this case fails for the additional reason that there is no evidence upon which a court could conclude that visitation would be in the best interests of the children, which must be established by clear and convincing evidence before a court can even consider ordering grandparent visitation under § 43-1802(2). Other than a general conclusory statement by Jacqueline that she felt it would be in the children's best interests to have ongoing contact with the rest of Deborah's side of the family, the only evidence regarding the best interests of the children was testimony by Deborah, summarized above, explaining why she did not believe that grandparent visitation would be beneficial to her children. In *Pier v. Bolles*, 257 Neb. 120, 129, 596 N.W.2d 1, 8 (1999), we held that the trial court abused its discretion in ordering grandparent visitation where the evidence consisted solely of the grandmother's statement that she had " 'a close, loving relationship with [the grandchild] since his birth' " and that she and her husband had exercised regular visitation when permitted. Here, the evidence regarding best interests of the children does not even rise to this level.

Thus, there is a completely inadequate factual basis for the finding of the district court that "it [wa]s in the best interests of said children that the grandparent-grandchildren relationship continue." In announcing his holding from the bench, the district judge explained:

> Here is what I honestly think. I think there has been so much turmoil in these kids' lives that regardless of whether the grandparents and [Deborah] get along, I think it is of a significant beneficial relationship to these kids that they have a relationship with their grandparents and I don't think if I leave it up to [Deborah], it's going to happen.

While we certainly agree with the general proposition that a strong and healthy relationship with grandparents is in the best interests of children, that is not the issue before us. In the legitimate exercise of her parental rights, Deborah has concluded that the interests of *her* children would not be served by an ongoing relationship with *their* grandparents at the present time, given the generally strained familial relationship. Whether or not we agree with that decision, we do not have legal authority to countermand it by ordering grandparent visitation in the absence of clear and

convincing evidence that "a significant beneficial relationship exists, or has existed in the past, between the grandparent and the child and that it would be in the best interests of the child to allow such relationship to continue." See § 43-1802(2). The statutory requirement that grandparents present such evidence before a court may even consider ordering visitation gives proper deference to the fundamental right of a fit parent to make decisions regarding their children's upbringing. See *Troxel v. Granville*, 530 U.S. 57, 72-73, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion) ("the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made"). Because the grandparents in this case did not meet their evidentiary burden, the Court of Appeals correctly reversed the visitation order and remanded the cause with directions to dismiss.

## CONCLUSION

Based on the foregoing analysis, we conclude on further review that the Court of Appeals did not err in determining that the trial court abused its discretion in granting the grandparents visitation with the children, and we therefore affirm the judgment in case No. S-02-252, which reverses the visitation order and remands the cause with directions to dismiss. Inasmuch as there is no assignment of error directed to the Court of Appeals' disposition of case No. S-02-512, we likewise affirm the judgment of dismissal in that case.

AFFIRMED.

McCORMACK, J., concurring in part, and in part dissenting.

I concur with the majority that the McKerns failed to present clear and convincing evidence of a significant beneficial relationship with the children. However, I respectfully dissent from the majority's conclusion that Arlene failed to prove by clear and convincing evidence that (1) a significant beneficial relationship existed between herself and the children and (2) it would be in the best interests of the children to allow such relationship to continue. I would reverse the Court of Appeals' decision in part and restore the district court's award of visitation rights to Arlene.

Any inquiry into the "significant beneficial relationship" requirement of Neb. Rev. Stat. § 43-1802(2) (Reissue 1998) will necessarily be "fact-dependent." *Rosse v. Rosse*, 244 Neb. 967, 973, 510 N.W.2d 73, 78 (1994). The record in this case indicates that Arlene was the children's daycare provider for about 2 years. She went to Deborah and Terry's house every day at about 6:15 a.m., cleaned the kitchen, fed the children breakfast, took them to school, and picked them up from school. During the summer, Arlene took them to and picked them up from swimming lessons and again watched them on a daily basis. Based on this evidence, I would conclude that the district court did not abuse its discretion in finding that a significant beneficial relationship existed between Arlene and the children.

The majority reaches the opposite conclusion because Arlene's testimony "reveals nothing about the nature of the relationship" between herself and the children and leaves unclear whether that relationship was "congenial or acrimonious, affectionate or indifferent, trusting or deceitful, loving or simply custodial." The majority's construction of the "significant beneficial relationship" prong of § 43-1802(2) apparently requires evidence of an interpersonal, emotional bond between grandparent and grandchild. The majority contrasts this case with *Rosse v. Rosse, supra,* where there was plentiful evidence of hugs and kisses between grandparents and their grandchild. I certainly agree that outward signs of affection between grandparents and grandchildren, such as those in *Rosse,* are evidence that a significant beneficial relationship exists. However, there are many ways a grandparent can establish a relationship with a grandchild that is beneficial to both the grandparent and, more important, to the grandchild. In this case, Arlene attended to the children's needs every day for 2 years and performed many of the same tasks that a parent might otherwise perform. Arlene's contact with the children is not appreciably different than the contact between the grandparents and grandchild in *Rosse.* There, the grandmother read stories to her grandchild and the grandfather took his grandchild to the park and zoo, he played with her, and apparently they went "places" together. *Rosse v. Rosse*, 244 Neb. at 974, 510 N.W.2d at 78. The primary distinction between the grandparent-grandchild relationship in *Rosse* and the one in this case is not the contacts, but the

additional evidence of hugs and kisses in *Rosse*. I would not find the presence or absence of such evidence in the record dispositive of the issue. Common sense indicates to me that caring for your grandchildren's everyday needs for 2 years constitutes clear and convincing evidence that a significant beneficial relationship exists. In light of these findings, I would also conclude that the district court did not abuse its discretion in finding that it was in the best interests of the children that their relationship with Arlene continue. See *Rosse v. Rosse, supra.*

The final criterion of § 43-1802 required Arlene to prove by clear and convincing evidence that visitation would not adversely interfere with the parent-child relationship. As indicated by the statement Arlene made at trial, the relationship between herself and Deborah may be fairly characterized as strained. Were it not, court-ordered visitation would be unnecessary. However, there is no evidence that Arlene has ever directed toward the children any scorn she feels about Deborah or has otherwise sought to undermine or disparage Deborah in the children's presence. Furthermore, the district court's order expressly prohibited such comments from being made in the future. I would conclude that the district court did not abuse its discretion in concluding that Arlene's visitation would not adversely interfere with the parent-child relationship. For all of the above reasons, I believe the Court of Appeals erred in reversing the district court's award of visitation rights to Arlene.