Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/22/2021 08:09 AM CDT

Nathan M. Lindblad, appellant, v.
Jessica N. Lindblad, appellee,
and Norman A. McConnell
and Cheri B. McConnell,
intervenors-appellees.

___ N.W.2d ___

Filed July 30, 2021.    No. S-20-400.

1. **Modification of Decree: Child Custody: Visitation: Child Support: Appeal and Error.** Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion.

2. **Visitation: Appeal and Error.** Determinations concerning grandparent visitation are initially entrusted to the discretion of the trial court, whose determinations on appeal will be reviewed de novo on the record and affirmed in the absence of an abuse of the trial court's discretion.

3. **Modification of Decree: Child Custody: Proof.** Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child require modification.

4. ____: ____: ____. Modifying a custody or parenting time order requires two steps of proof. First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests.

5. **Modification of Decree: Words and Phrases.** Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently.

6. **Modification of Decree: Child Custody: Proof.** Proof of a material change in circumstances is the threshold inquiry in a proceeding on a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances.

7. **Visitation: Proof.** A grandparent seeking visitation must prove by clear and convincing evidence that (1) there is, or has been, a significant beneficial relationship between the grandparent and the child; (2) it is in the best interests of the child that such relationship continue; and (3) such visitation will not adversely interfere with the parent-child relationship.

8. **Evidence: Proof: Words and Phrases.** Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.

9. **Evidence: Appeal and Error.** When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than the other.

10. **Moot Question.** Mootness refers to events occurring after the filing of a suit which eradicate the requisite personal interest in the resolution of the dispute that existed at the beginning of the litigation.

11. ____. A case is not moot if a court can fashion some meaningful form of relief, even if that relief only partially redresses the prevailing party's grievances.

Appeal from the District Court for Gage County: Ricky A. Schreiner, Judge. Affirmed as modified.

Jeffrey A. Gaertig, of Smith, Schafer, Davis & Gaertig, L.L.C., for appellant.

Jessica N. Lindblad, pro se.

Jeffrey B. Hubka, of Hubka & Hubka, for intervenors-appellees.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Stacy, J.

In 2018, the district court modified the custody and parenting time provisions in a dissolution decree after finding the mother was not properly caring for the parties' young child

and was using controlled substances. The order of modification gave custody to the father and required the mother's parenting time to be supervised by the maternal grandparents. In 2019, the father sought to modify the order again, requesting to suspend the mother's supervised parenting time indefinitely because of her continued substance use. The district court denied the modification, finding there had been no material change in circumstances affecting the best interests of the child. In a separate order, the court granted the maternal grandparents' complaint for grandparent visitation. The father appeals from both orders.

The primary issues on appeal are whether the mother's continued substance use and related arrests presented a material change in circumstances sufficient to support modification and whether the grandparents satisfied their burden of proof regarding grandparent visitation. Because our de novo review reveals no abuse of discretion in denying the requested modification or allowing grandparent visitation, we affirm.

## I. BACKGROUND

Nathan M. Lindblad and Jessica N. Lindblad were married on a date which is unclear from our record. In 2013, a daughter, F.L., was born to the marriage. In November 2016, the parties divorced. Although the dissolution decree is not in our record, other evidence indicates the decree awarded Jessica physical custody of F.L., subject to Nathan's regular parenting time.

### 1. 2018 Modification

Sometime after the decree was entered, Nathan filed a complaint to modify, seeking a change in F.L.'s custody. That complaint is not in our record, but the basis for seeking modification is apparent from the face of the court's modification order, which was entered February 9, 2018. That order found there had been a material change in circumstances affecting the best interests of F.L., in that Jessica was no longer providing a safe, nurturing environment for the child. The court made a specific finding that Jessica had not been properly caring

for F.L., and it recited that Jessica had obtained a drug and alcohol evaluation and a mental health evaluation, but had not complied with the treatment recommendations. Jessica had also been involved in dating relationships with men who physically assaulted her, and the court found she demonstrated a pattern of poor decisionmaking by continuing to have contact with one of her abusers and attempting to conceal it.

The modification order granted Nathan primary legal and physical custody of F.L., and it awarded Jessica supervised parenting time on alternating weekends from Friday at 6 p.m. until Sunday at 6 p.m. and on every Tuesday and Wednesday from 4 to 7:30 p.m. The court ordered Jessica's parenting time to be supervised by F.L.'s maternal grandparents. The modification order included a provision discouraging requests to modify Jessica's parenting time "until such time as she has completed both drug/alcohol and mental health counseling . . . and has demonstrated the ability to maintain sobriety for a significant period of time thereafter."

## 2. Complaint to Modify and Ex Parte
### Order Suspending Visitation

Approximately 15 months later, in May 2019, Nathan filed another complaint to modify, this time asking that Jessica's parenting time be suspended indefinitely. His complaint alleged there had been a material change in circumstances affecting the best interests of F.L., in that Jessica had been arrested and charged with several drug offenses since the last modification. The complaint alleged that Jessica's most recent arrest occurred at a sports facility immediately following F.L.'s youth soccer game. Based on these events, Nathan alleged Jessica had "deliberately and knowingly exposed [F.L.] to narcotics" during her parenting time and was no longer "a fit and proper person to have parenting time."

Along with the complaint to modify, Nathan filed a motion requesting an ex parte order immediately suspending Jessica's parenting time; the motion was supported by Nathan's

affidavit and the affidavit of the officer who arrested Jessica after the soccer game. Nathan's affidavit recited that Jessica had been arrested after the soccer game and that Jessica knew her purse contained methamphetamine while she was holding F.L. on her lap. The officer's affidavit stated that Jessica was approached by officers in the parking lot after the soccer game and advised of an active arrest warrant for driving under suspension and no proof of insurance. Jessica was carrying a purse at the time, and she gave officers consent to look inside it. When they did, they found what later tested positive for methamphetamine. Jessica was arrested on the warrant and for possession of a controlled substance and possession of drug paraphernalia.

Based on these affidavits, the court issued an ex parte order suspending Jessica's parenting time pending an evidentiary hearing. After that hearing, the court entered a temporary order reducing Jessica's supervised parenting time to 4 hours each Wednesday, to be supervised by "Better Living Counseling Services or [a] similar agency." The temporary order required Jessica to pay the costs of such supervision, and it expressly conditioned each visit upon Jessica's passing a drug screen and submitting to a search of her person.

### 3. Grandparent Intervention and Temporary Agreement

A few months later, the maternal grandparents intervened in the modification action to file a complaint seeking grandparent visitation with F.L. The parties agreed to a consolidated trial on Nathan's complaint to modify and the grandparents' complaint for visitation.

Before trial occurred, Nathan and the grandparents mediated a temporary agreement under which the grandparents would have regular visitation with F.L. for 5 hours every other Sunday afternoon. The mediated agreement provided that Jessica would not be present during the grandparents' temporary visitation. The court entered a temporary order consistent with the parties' mediated agreement.

### 4. Trial Evidence

In May 2020, the consolidated trial was held. Jessica appeared pro se, and all other parties appeared with counsel. Nathan's complaint to modify was tried first, followed by the grandparents' complaint for visitation. As pertinent to the issues on appeal, the following evidence was adduced.

### (a) Nathan

Nathan testified that he and his current wife have four children between them, ranging in age from 4 months to 10 years. Nathan stated he filed the complaint to modify because Jessica had drugs in her purse at the soccer game and F.L. was playing "at least within two f[ee]t" of the purse. He admitted the grandparents were at the soccer game supervising F.L.'s interactions with Jessica. Nathan testified that after the game, he was walking with F.L. to his vehicle when he saw police officers approaching Jessica. Nathan saw what was happening and took steps that prevented F.L. from seeing Jessica's arrest. Nathan testified that was Jessica's third arrest for drug possession.

Nathan admitted he was aware, before the 2018 custody modification, that Jessica had a problem with drug use. But he testified the problem was "not getting better" and he was particularly concerned about Jessica's most recent arrest at F.L.'s soccer game because drugs were found in Jessica's purse and F.L. had been near the purse. Nathan admitted that F.L. had not been present during Jessica's other arrests. In response to a question from the court, Nathan testified that the only time he thought F.L. was in danger was when Jessica was arrested at the soccer game; Nathan did not believe F.L. had ever been in danger when the grandparents were supervising Jessica's parenting time.

Nathan asked the court not to reinstate Jessica's parenting time until she demonstrated the ability to maintain sobriety. He proposed that Jessica's parenting time be suspended altogether until her pending criminal cases were resolved.

Thereafter, Nathan proposed a phased parenting plan under which Jessica would initially have supervised parenting time at an agency like Better Living Counseling Services (Better Living), where she could be screened for drugs. Assuming that went well, Nathan proposed that Jessica's parenting time could progress to being supervised by the grandparents, and eventually progress to being unsupervised.

With respect to the grandparents' complaint for visitation, Nathan agreed that F.L. had a significant beneficial relationship with her maternal grandparents, and he testified that he wanted that relationship to continue. But Nathan opposed a set visitation schedule with the grandparents, and instead, he preferred to have discretion as to when F.L. would see her grandparents, similar to the discretion Nathan exercised with respect to his own parents. Nathan did not think the temporary grandparent visitation schedule agreed to by the parties had been working well with his family's busy schedule, explaining:

> The weekends are when we have the time to spend with our family. . . . With sporting events and stuff, I just — it's not fair, like, okay, we are going to a sporting event and [F.L.] has to stay back because she has to go see grandma and grandpa instead of staying in a motel and swimming and she misses out on family functions.

Nathan also testified that sometimes F.L. "[did not] listen" after she returned from visits with her grandparents.

(b) Jessica

Jessica testified that she had been working full time as a bartender before the coronavirus pandemic, but at the time of trial, she was unemployed and living with F.L.'s grandparents. She admitted there were two criminal cases pending against her for drug possession; both were set for trial in May 2020, and plea negotiations were ongoing. Jessica admitted she had been arrested three times for possession of controlled substances, but testified that none of the arrests occurred during her parenting time.

Jessica admitted she had undergone a drug and alcohol evaluation in connection with her pending criminal cases, but she declined to testify about the results of that evaluation, other than to say she had been participating in counseling. Jessica also admitted to failing 4 of the 32 drug tests at Better Living, but she claimed the failed tests were misinterpreted, and she specifically denied being under the influence of illegal drugs while in F.L.'s presence. Jessica invoked the Fifth Amendment when asked whether she had ever possessed drugs while exercising parenting time.

### (c) Better Living Supervisor

The records custodian and supervisor from Better Living testified about Jessica's supervised parenting time under the court's temporary order. He testified that from September 2019 through April 2020, Jessica scheduled 32 supervised visits with F.L. at Better Living. The process required Jessica to prepay for each visit several days ahead of time, at a cost of $50 for each hour. Then, on the day of the scheduled visitation, Jessica would arrive early and provide a urine sample, for which she paid another fee of $50. If the test was negative for controlled substances, Nathan was contacted and the supervised visitation occurred.

The supervisor testified that of the 32 scheduled visits, Jessica tested positive for methamphetamine four times and was a "no-show" twice. Regarding the supervised visits that did occur, no evidence was adduced of any concerns, and the supervisor testified that the visit he personally supervised "went well."

### (d) F.L.'s Therapist

The licensed therapist who had been treating F.L. since January 2019 also testified at trial. She stated that F.L., who was 6 years old at the time, had been diagnosed with attention deficit hyperactivity disorder and post-traumatic stress disorder and was taking medication for each condition. She opined that F.L.'s trauma was "related to when she was living with her

biological mom," but she provided no specifics regarding the nature of that trauma. The therapist confirmed that she had not identified any trauma sustained by F.L. since the 2018 custody modification and that currently F.L. is working through her past trauma and "doing well." When asked whether F.L. has any issues with respect to visitation with Jessica, the therapist replied, "The only concern is that when her mother does not have a visit, that increases her worry . . . ." The therapist opined that visits with Jessica "need to be consistent."

Regarding grandparent visitation, the therapist testified that during 2 of the 17 therapy sessions with F.L., the child expressed anxiety about visitation with her grandparents, reporting that her grandmother had made negative comments about Nathan's current wife. In response to questioning from the court, the therapist admitted that she told Nathan what F.L. had reported, but had not followed up with or reached out to the grandparents to learn their version of events. According to the therapist, F.L. expressed that she "wishes everybody would love her and stop being negative about other family members."

(e) Grandparents

Before offering evidence, the grandparents advised the court that if Jessica's parenting time was suspended indefinitely, they were requesting visitation with F.L. every other weekend, but if Jessica continued to have supervised parenting time with F.L., the grandparents would plan to see F.L. during Jessica's parenting time.

The grandmother testified that she and the grandfather had been supervising Jessica's parenting time with F.L. since September 2017. Those visits had occurred every other weekend, as well as Monday and Tuesday evenings, and the grandparents had not missed any visits. The grandmother testified that even after Jessica's supervised parenting time was switched to Better Living, the grandparents still had regular visits with F.L. under the mediated agreement and temporary order. An exhibit was received documenting 34 such visits during the 11 months immediately preceding trial.

The grandmother generally testified that F.L. was happy and engaged when she was with them and that she would sometimes accompany them on visits to see extended family and interact with F.L.'s aunts, uncles, and cousins. The grandmother thought F.L. benefited from spending time with her grandparents and thought it was in F.L.'s best interests to have a continuing relationship with them, as well as a relationship with F.L.'s extended family on Jessica's side. The grandmother testified that she had no intention of interfering with Nathan's rights as a father or his time with the child, and she generally denied making negative comments about Nathan's current wife. The grandmother testified that although Jessica was living with them, they ask Jessica to leave on the days they have visitation with F.L. and Jessica complies.

The grandfather testified that if asked the same questions as the grandmother, he would give substantially the same answers. He also testified that he felt it was important to communicate with Nathan, and the grandparents made an effort to keep Nathan apprised of F.L.'s activities and meals during their visits. The grandfather wanted to have a good relationship with Nathan, but felt the relationship had deteriorated during the past several months.

## 5. DISTRICT COURT ORDERS

### (a) Complaint to Modify

On May 22, 2020, the district court entered an order denying Nathan's complaint to modify Jessica's parenting time. The court concluded that Jessica's continued substance use and drug-related arrests did not amount to a material change in circumstances affecting the best interests of the child. The court reasoned that the 2018 modification order showed Jessica's substance use was one of the reasons for awarding F.L.'s legal and physical custody to Nathan and for requiring all of Jessica's parenting time to be supervised by the grandparents. The court acknowledged there had been an increase in Jessica's drug-related arrests since the 2018 modification, but

it found that none of the arrests occurred in F.L.'s presence, and there was no evidence that Jessica's conduct had placed F.L. in danger or that she had exposed F.L. to narcotics during her parenting time. It further found the grandparents had provided safe supervision for Jessica's parenting time, and there was no evidence that supervision by Better Living was necessary to ensure F.L.'s safety during Jessica's parenting time. The order thus denied Nathan's request to indefinitely suspend Jessica's parenting time, and it directed the parties to resume the supervised parenting time schedule under the 2018 modification, with the grandparents' providing the supervision.

### (b) Grandparent Visitation

The same day, in a separate order, the district court granted the complaint for grandparent visitation. Citing the three-factor test from *Hamit v. Hamit*,[1] the court found the grandparents had proved, by clear and convincing evidence, (1) that there exists a significant beneficial relationship, past or present; (2) that it is in the best interests of the child that such relationship continue; and (3) that such visitation will not adversely interfere with the parent-child relationship. The court acknowledged Nathan's resistance to a set visitation schedule, but found the temporary grandparent visitation had been going well, and Nathan had presented no evidence that having a set schedule would interfere with his relationship with F.L. even if it might be somewhat inconvenient to his family's activities. Moreover, the court found that regular grandparent visitation provided "a critical link" between F.L. and her mother, as well as maintaining the relationship with F.L.'s "like age cousins" and extended family.

As to setting a schedule for grandparent visitation, the court's order stated:

---

[1] *Hamit v. Hamit*, 271 Neb. 659, 715 N.W.2d 512 (2006). See, also, *Nelson v. Nelson*, 267 Neb. 362, 674 N.W.2d 473 (2004*); Eberspacher v. Hulme*, 248 Neb. 202, 533 N.W.2d 103 (1995).

[B]ased on the Court's order in the Custody Modification, the Court is not defining a set schedule because [the grandparents] will be seeing [the child] while they supervise parenting time with her mother. Should that change in the future, [the grandparents] should move this Court for a specific schedule and that will be ordered after a hearing where all parties can be heard and offer suggested schedules to the Court.

Nathan timely appealed from both the order denying modification and the order allowing grandparent visitation. We moved the appeal to our docket on our own motion.

## II. ASSIGNMENTS OF ERROR

Nathan assigns the district court erred in (1) denying his complaint to modify and (2) ordering grandparent visitation.

## III. STANDARD OF REVIEW

[1] Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion.[2]

[2] Determinations concerning grandparent visitation are initially entrusted to the discretion of the trial court, whose determinations on appeal will be reviewed de novo on the record and affirmed in the absence of an abuse of the trial court's discretion.[3]

## IV. ANALYSIS

### 1. Complaint to Modify

Nathan presents two arguments in support of his assignment that the district court erred in denying his complaint to modify. First, he argues that even though the 2018 modification was also premised on Jessica's substance use, the court should

[2] *Windham v. Kroll*, 307 Neb. 947, 951 N.W.2d 744 (2020).
[3] *Heiden v. Norris*, 300 Neb. 171, 912 N.W.2d 758 (2018).

have found a material change in circumstances due to Jessica's continued substance use and an increase in drug-related arrests. Next, he argues the court abused its discretion in failing to separately address his claims that Jessica's continued substance use rendered her unfit to exercise even supervised parenting time. We address each argument in turn, but first, we review the governing legal principles.

[3,4] Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child require modification.[4] Modifying a custody or parenting time order requires two steps of proof.[5] First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child.[6] Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests.[7] Here, the district court found that Nathan had not met his burden of proving a material change in circumstances affecting F.L.'s best interests, so we focus our analysis on that inquiry.

[5,6] Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently.[8] We have explained that proof of a material change in circumstances is the "threshold inquiry in a proceeding on

---

[4] See, *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020); *VanSkiver v. VanSkiver*, 303 Neb. 664, 930 N.W.2d 569 (2019); *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019).

[5] See, *Weaver v. Weaver*, 308 Neb. 373, 954 N.W.2d 619 (2021); *Jones, supra* note 4; *Eric H., supra* note 4.

[6] See *id.*

[7] See *id.*

[8] See, *Weaver, supra* note 5; *Eric H., supra* note 4.

a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances."[9] The rationale for limiting modifications of custody and parenting time to only those necessitated by a material change in circumstances is to avoid extensive and repetitive litigation and unnecessary, potentially harmful fluctuations in the child's life.[10] Simply put, a custody or parenting time order will not be modified absent proof of new facts and circumstances arising since the order was entered that affect the best interests of the child.[11]

Here, Nathan generally concedes that when the 2018 modification order was entered, the parties and the court were aware of, and attempting to address, the impact of Jessica's substance use. This is amply supported by the record, as the face of the 2018 modification order shows that the change in custody and the supervised visitation were put in place to address evidence of Jessica's substance use and poor decision-making. Furthermore, the 2018 modification order appears to have anticipated the possibility that Jessica's substance use would continue, as it directed that future modifications to her parenting time would not be entertained unless she "completed both drug/alcohol and mental health counseling . . . and has demonstrated the ability to maintain sobriety for a significant period of time thereafter."

Nathan does not argue that the nature or severity of Jessica's substance use has changed significantly since the 2018 modification, and he adduced no evidence of such a change. Instead, he argues that her "continued drug use and multiple arrests for drug possession,"[12] and "especially her arrest"[13] at the

---

[9] *Weaver, supra* note 5, 308 Neb. at 388, 954 N.W.2d at 630, citing *Eric H., supra* note 4.

[10] See *id.*

[11] See *id.*

[12] Brief for appellant at 15.

[13] *Id.*

youth soccer game, support finding a material change in circumstances. We understand Nathan to be arguing that even if Jessica's use of illegal substances is essentially the same now as it was in 2018, the evidence showed that her drug-related arrests have increased, and that such evidence is enough to prove a material change in circumstances affecting F.L.'s best interests.

Our case law demonstrates that an increase or escalation in parental instability or parental behavior that affects the best interests of the child can support a judicial finding that there has been a material change in circumstances, even if there is some evidence of similar behavior in the past.[14] In *Jones v. Jones*,[15] we found that an increase in the custodial mother's periods of unemployment and resulting housing instability since the prior modification had affected the best interests of the child by exposing him to frequent moves and requiring him to "liv[e] alongside people who were verbally and physically abusive to [his mother], used illegal drugs, engaged in criminal activity, and had violent tempers." We concluded that even though the mother had experienced periods of unemployment and financial difficulty in the past, the escalation in those circumstances since the prior modification amounted to a material change in circumstances affecting the best interests of the child and supported a modification in custody and fewer overnight visits at the mother's home.[16]

Similarly, in *VanSkiver v. VanSkiver*,[17] we found that a post-decree escalation in the father's angry, abusive, and threatening behavior toward his minor sons amounted to a material change in circumstances affecting the best interests of the children and supported modifying the decree to indefinitely suspend the father's parenting time. We expressly rejected the father's

---

[14] See, *Jones, supra* note 4; *VanSkiver, supra* note 4.

[15] *Jones, supra* note 4, 305 Neb. at 630, 941 N.W.2d at 512.

[16] See *Jones, supra* note 4.

[17] *VanSkiver, supra* note 4.

contention that there was no proof of a material change in circumstances because his ex-wife was "afraid of him at the time of their divorce due to his threatening behavior, so the fact that she remains afraid of him due to his threatening behavior is nothing new."[18]

Nathan is correct that evidence in our record shows an increase in the number of Jessica's drug-related arrests since the 2018 modification. Before the 2018 modification, Jessica was arrested for possession of methamphetamine, marijuana, alprazolam, Suboxone, and drug paraphernalia. Approximately 8 months after the 2018 modification, Jessica was arrested again for possession of methamphetamine, marijuana, codeine, and drug paraphernalia. Then roughly 7 months later, Jessica was arrested for possession of methamphetamine after F.L.'s soccer game.

Nathan has presented concerning evidence that Jessica's continued drug use has, quite predictably, led to continued drug-related arrests. But even if we assume that the increase in Jessica's arrests was unanticipated at the time of the 2018 modification, we agree with the district court that Nathan has failed to adduce evidence showing that the additional arrests present a material change in circumstances that has affected the best interests of F.L. and require a change to Jessica's supervised parenting time.

It is undeniable that a parent's use of illegal substances can expose minor children to dangerous and illegal activity; can interfere with the parent's ability to provide safe, stable, and appropriate care for the children; and can cause deterioration of the parent-child relationship. Additionally, a parent's habitual use of alcohol or drugs can render the parent unfit when their conduct is found by the court to be seriously detrimental to the health, morals, or well-being of the juvenile.[19] But there

---

[18] *Id.* at 671, 930 N.W.2d at 574.

[19] See, e.g., Neb. Rev. Stat. § 43-292 (Reissue 2016); *In re Interest of Joshua M. et al.*, 256 Neb. 596, 591 N.W.2d 557 (1999).

was no such evidence adduced at trial in this case. Instead, the evidence showed that, at least so far, the significant modifications to custody and parenting time made in the 2018 order have protected F.L. from the potentially serious and predictable consequences of Jessica's substance use by giving legal and physical custody to Nathan and requiring Jessica's limited parenting time to be fully supervised.

In our de novo review, we see no evidence that, since the 2018 modification, Jessica has been under the influence of drugs or alcohol during her supervised parenting time, nor was there evidence that she has exposed F.L. to dangerous people or illegal activity. Like Nathan, we are concerned by the fact that Jessica had drugs in her purse during F.L.'s soccer game, but the evidence showed that the grandparents were supervising F.L.'s interactions with Jessica during this time, and there is nothing in the record suggesting that F.L. had contact with or access to the purse, or contact with any controlled substances. Further, there is no evidence that Jessica's continued substance use or her arrests have made her unavailable or unable to exercise parenting time. Moreover, the evidence was undisputed that the relationship between F.L. and Jessica continues to be good. According to F.L.'s therapist, the only current concern regarding Jessica's visitation is that when visits do not occur, it causes F.L. to worry.

Nor are we persuaded that Nathan has shown Jessica's continued substance use necessarily renders her unfit to exercise even supervised parenting time. We simply see no evidence that the existing supervised parenting time conditions have been, or may be, inadequate to address the obvious safety concerns accompanying Jessica's continued use of controlled substances.[20] While we have no doubt that sobriety would vastly improve Jessica's opportunities to meaningfully parent

---

[20] See, e.g., *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 936 N.W.2d 733 (2020) (finding insufficient evidence to adjudicate children on ground they had been exposed to mother's persistent drug use when mother had placed children in grandmother's care).

F.L., Nathan has not shown that Jessica's ongoing substance use, or an increase in her drug-related arrests, presents a material change in circumstances that has affected F.L.'s best interests and requires modifying the supervised visitation provisions under the 2018 modification order.

Stated differently, had the district court known of Jessica's continued drug use and additional arrests at the time it entered the 2018 modification order, we are not persuaded it would have imposed any different custody arrangement or supervised parenting time provisions. Instead, the record shows the supervised parenting time schedule the court imposed in 2018 continues to be necessary and, at least so far, has been an effective way to maintain the important parent-child relationship while keeping F.L. safe. On this record, the district court did not abuse its discretion in denying Nathan's complaint to modify.

2. Grandparent Visitation

In his second assignment of error, Nathan argues the district court erred in awarding grandparent visitation. His primary argument is that the grandparents failed to meet their burden of proof. He also argues the district court abused its discretion in failing to set a specific schedule for grandparent visitation. We begin our analysis with a review of the legal principles governing grandparent visitation.

(a) Legal Principles

Grandparent visitation in Nebraska is governed by statute. Neb. Rev. Stat. § 43-1801 (Reissue 2016) defines a grandparent as the "biological or adoptive parent of a minor child's biological or adoptive parent." Neb. Rev. Stat. § 43-1802 (Reissue 2016) provides that a grandparent may seek visitation if, among other things, the marriage of the child's parents has been dissolved. In determining whether a grandparent shall be granted visitation, § 43-1802 provides:

> (2) . . . [T]he court shall require evidence concerning the beneficial nature of the relationship of the

grandparent to the child. The evidence may be presented by affidavit and shall demonstrate that a significant beneficial relationship exists, or has existed in the past, between the grandparent and the child and that it would be in the best interests of the child to allow such relationship to continue. Reasonable rights of visitation may be granted when the court determines by clear and convincing evidence that there is, or has been, a significant beneficial relationship between the grandparent and the child, that it is in the best interests of the child that such relationship continue, and that such visitation will not adversely interfere with the parent-child relationship.

(3) The court may modify an order granting or denying such visitation upon a showing that there has been a material change in circumstances which justifies such modification and that the modification would serve the best interests of the child.

[7,8] Summarizing these statutory requirements, we have explained that a grandparent seeking visitation must prove by clear and convincing evidence that (1) there is, or has been, a significant beneficial relationship between the grandparent and the child; (2) it is in the best interests of the child that such relationship continue; and (3) such visitation will not adversely interfere with the parent-child relationship.[21] Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved.[22]

As noted, Nathan conceded at trial that the grandparents and F.L. have a significant beneficial relationship, and we do not understand him to argue otherwise on appeal. Rather, Nathan's argument is that the grandparents failed to meet their burden of proving the second and third elements recited above.

---

[21] *Hamit, supra* note 1. See, also, *Nelson, supra* note 1; *Eberspacher, supra* note 1.

[22] *Hamit, supra* note 1.

As we explain, our de novo review of the record persuades us otherwise.

### (b) Grandparents Met Burden of Proof

Our review of the record demonstrates the grandparents met their burden of proving both that it was in F.L.'s best interests to continue the relationship with her maternal grandparents and that grandparent visitation would not adversely interfere with the parent-child relationship. We address each element of proof in order.

The record contains clear and convincing evidence that it is in F.L.'s best interests for her relationship with her maternal grandparents to continue. First, we observe this issue was not really contested at trial; Nathan testified that he believed the relationship between F.L. and her grandparents was beneficial and should continue, but he did not want a set visitation schedule. Furthermore, the parties' temporary mediated agreement, entered into evidence at trial, expressly stated that "all [parties believe] that it is in the best interest of [F.L.] (age 6) to share as full a relationship as possible with both Nathan and her maternal grandparents." There was also ample evidence that continuing F.L.'s relationship with her grandparents helps to facilitate safe and structured interaction with F.L.'s mother, her same-age cousins, and her extended family, which is also in F.L.'s best interests. Similar grandparent relationships have been found to be in the child's best interests in other cases decided by this court.[23]

Nathan's primary contention, both before the district court and on appeal, is that the grandparents did not meet their burden of proving the third element of grandparent visitation: that allowing such visitation will not adversely interfere with the parent-child relationship. According to Nathan, ordering grandparent visitation on "a mandated schedule would adversely interfere with his relationship with [F.L.] and his nuclear

---

[23] See, *Hamit, supra* note 1; *Rosse v. Rosse*, 244 Neb. 967, 510 N.W.2d 73 (1994).

family consisting of [his current wife] and their other three children."[24] We addressed a similar argument in *Hamit*.[25]

There, the paternal grandparents sought visitation after their son died. On the question of whether allowing grandparent visitation would adversely interfere with the parent-child relationship, a psychologist interviewed the grandparents and testified she did not think they were harboring resentment toward the mother, and other witnesses testified they had never heard the grandparents speak negatively about the mother in the presence of the children. The grandparents testified that they had no animosity toward the mother and that they tried to follow the mother's directions and wishes concerning the care of the children, including returning the children early when requested. However, the record also contained testimony from the children's therapist that one of the children did not want to visit his grandparents and was afraid of them. The trial court did not find this aspect of the therapist's testimony credible, noting she had never talked with the grandparents or observed the children with the grandparents, and other evidence in the record directly contradicted the suggestion that the children were scared while visiting their grandparents. On our de novo review, we concluded in *Hamit* that despite evidence of a strained relationship between the grandparents and the mother, the grandparents had shown by clear and convincing evidence that grandparent visitation of 10 hours per month and 7 days in the summer would not adversely interfere with the parent-child relationship.

In contrast, in *Morris v. Corzatt*,[26] we found the grandparents had not sufficiently proved the third factor of the grandparent visitation test. In that case, after the father was killed in an automobile accident, the maternal grandparents sought visitation. The children's mother opposed visitation, and she testified

---

[24] Brief for appellant at 23.

[25] See *Hamit, supra* note 1.

[26] *Morris v. Corzatt*, 255 Neb. 182, 583 N.W.2d 26 (1998).

that she felt the grandparents undermined her authority with the children by ignoring her wishes regarding discipline, telling the children how much better things were at the grandparents' home compared to their mother's home, and even taking one of the children to an eye doctor without the mother's permission. Other witnesses observed that the relationship between the mother and the grandparents was significantly strained and that they appeared to be competing to "one-up the other for the children's affection."[27] There was also testimony that the grandparents told the guardian ad litem "'[t]he children would be better off with us, we could raise them better.'"[28]

The district court in *Morris* concluded that the persistent animosity and competition between the grandparents and the mother was unhealthy for the children, undermined the mother's parental authority, and adversely affected the parent-child relationship. On de novo review, we agreed and found no abuse of discretion in denying grandparent visitation.

[9] Here, the facts are far more similar to those in *Hamit* than those in *Morris*. There was no evidence that the grandparents were attempting to undermine Nathan's authority with F.L. by ignoring his wishes regarding discipline or diet. To the contrary, they testified they try to communicate with Nathan and respect his wishes about how to discipline and feed F.L. during visitation, and they wanted to maintain a positive relationship. There was evidence that the grandmother spoke negatively about Nathan's current wife—a claim the grandparents denied—but it is plainly apparent that the district court considered the grandparents' testimony on this issue to be more credible. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than the other.[29]

---

[27] *Id.* at 184, 583 N.W.2d at 28.

[28] *Id.* at 185, 583 N.W.2d at 28.

[29] *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020).

And to the extent Nathan seems to be arguing that grandparent visitation would interfere with his parent-child relationship simply because it would take F.L. away from her paternal nuclear family, we note that is not the type of interference with the parent-child relationship that this prong of the grandparent visitation test was intended to address. All grandparent visitation necessarily results in some time away from the natural parents, and the reasonableness of the visitation schedule is a separate issue from whether the grandparents have carried their burden of showing that visitation would not adversely interfere with the parent-child relationship. And in any event, as we discuss next, because the grandparent visitation time awarded in this case was coextensive with Jessica's parenting time, it will have no practical impact at all on the time F.L. spends with Nathan.

On this record, the district court did not abuse its discretion in finding the grandparents had proved all three factors of grandparent visitation by clear and convincing evidence.

### (c) Grandparent Visitation Schedule
### Was Not Abuse of Discretion

Nathan argues that even if grandparent visitation was properly ordered, the schedule set by the district court was an abuse of discretion. The district court's order found the grandparents met their burden of proof and "should be granted grandparent visitation time." It then directed:

> [B]ased on the Court's order in the Custody Modification, the Court is not defining a set schedule because [the grandparents] will be seeing [the child] while they supervise parenting time with her mother. Should that change in the future, [the grandparents] should move this Court for a specific schedule and that will be ordered after a hearing where all parties can be heard and offer suggested schedules to the Court.

Nathan argues that this visitation schedule was an abuse of discretion and "makes no practical sense in application or

enforcement."[30] First, he argues that once the court entered the order denying his complaint to modify and effectively reinstating Jessica's supervised parenting time, the grandparent visitation request was moot and the grandparent visitation order became simply "advisory"[31] because no case or controversy was before the court.

[10,11] Mootness refers to events occurring after the filing of a suit which eradicate the requisite personal interest in the resolution of the dispute that existed at the beginning of the litigation.[32] A case is not moot if a court can fashion some meaningful form of relief, even if that relief only partially redresses the prevailing party's grievances.[33]

The reinstatement of Jessica's supervised parenting time did not render the grandparents' request for visitation moot or merely advisory. Nothing in Nebraska's grandparent visitation statutes limits the grandparents to seeking visitation only if one of the parents does not have parenting time. And at least two Nebraska cases have affirmed awards of grandparent visitation even when both parents had parenting time.[34] The grandparents here pursued their statutory right to grandparent visitation, which ensured their legal right to visitation time with F.L. The fact that their grandparent visitation schedule was coextensive with Jessica's supervised parenting time, as explained below, does not render the relief ordered by the court any less meaningful. The reinstatement of Jessica's parenting

---

[30] Brief for appellant at 26.

[31] *Id.* at 28.

[32] *Nesbitt v. Frakes*, 300 Neb. 1, 911 N.W.2d 598 (2018).

[33] *Nebuda v. Dodge Cty. Sch. Dist. 0062*, 290 Neb. 740, 861 N.W.2d 742 (2015).

[34] See *Rosse, supra* note 23 (grandparents given 7 hours visitation every other month when mother had primary custody and father had 10 hours visitation every other weekend); *Beal v. Endsley*, 3 Neb. App. 589, 529 N.W.2d 125 (1995) (grandparents given visitation of fifth weekend of any month where father had primary custody and mother had parenting time).

time therefore did not render the grandparents' request for visitation moot or invalid.

Second, Nathan argues the grandparent visitation order is ineffective because it awarded no specific grandparent time. Setting aside questions of whether Nathan invited the very error about which he now complains, we disagree with Nathan that the court ordered an "open-ended 'wait and see'"[35] visitation schedule. We understand the court to have ordered a grandparent visitation schedule that was coextensive with Jessica's supervised parenting time.

The Nebraska Court of Appeals addressed a somewhat similar order in *Beal v. Endsley*.[36] In that case, the mother and father were divorced. The father, who lived in Alliance, Nebraska, had physical custody, and the mother, who lived in Colorado, had parenting time. The maternal grandparents, who lived in Kansas, sought grandparent visitation. The district court found the grandparents had met their burden of proof on all three grandparent visitation factors and awarded them

> "weekend visitation on the fifth weekend of any month that occurs. They shall also be allowed to exercise weekend visitation on any weekend or holiday that their daughter [the mother] is allowed visitation with the children. They may also have visitation during the summer months with the minor children when the daughter [the mother] has visitation with the minor children . . . ."[37]

The grandparents appealed, contending the visitation time awarded was insufficient and thus unreasonable under the statutes.

In examining the district court's order, the Court of Appeals found that the portion of the order stating the grandparents "'may'" have visitation during the summer did not award

---

[35] Brief of appellant at 26.

[36] *Beal, supra* note 34.

[37] *Id*. at 594, 529 N.W.2d at 129.

specific visitation, but simply recognized the grandparents had the opportunity to see the children during the mother's summer parenting time.[38] And it clarified that the portion of the order granting the grandparents visitation on the mother's holidays and weekends meant they could visit only when the mother invited them during this time. It thus construed the district court's order as awarding specific grandparent visitation time on only the fifth weekend of any month that occurs and analyzed whether such an award was reasonable.

Here, the district court similarly concluded the grandparents had met their burden of proof and were entitled to specific grandparent visitation. In addressing the visitation schedule, we construe the order to have declined setting a schedule that was separate from Jessica's existing supervised visitation schedule; instead, the court ordered that grandparent visitation would occur at the same time the grandparents were supervising Jessica's parenting time. Jessica has not opposed such a schedule and has not cross-appealed on the issue. Furthermore, we construe the order to acknowledge that if and when the grandparents are no longer supervising visits between Jessica and F.L., then they can seek to modify the grandparent visitation order, as is permitted under the grandparent visitation statute upon showing a material change in circumstances.[39]

We thus clarify that, having found the grandparents met their burden by clear and convincing evidence, the district court awarded them grandparent visitation coextensive with Jessica's supervised parenting time, which the grandparents are responsible for supervising under the 2018 order of modification. For the sake of clarity, we modify the order of grandparent visitation to reflect such a construction, and we reject Nathan's contention that the court's grandparent visitation order was an abuse of discretion.

---

[38] *Id.* at 598, 529 N.W.2d at 131.

[39] See § 43-1802(3).

## V. CONCLUSION

We affirm the district court's order denying Nathan's complaint to modify. And we affirm, as modified, the court's order awarding grandparent visitation.

Affirmed as modified.

Freudenberg, J., not participating.