IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

ROWLETTE V. BROWN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

CHRISTOPHER W. ROWLETTE, APPELLANT,

V.

NATALIE A. BROWN, APPELLEE.

Filed April 30, 2024.    No. A-23-576.

Appeal from the District Court for Douglas County: DUANE C. DOUGHERTY, Judge. Affirmed as modified.

Matthew Stuart Higgins, of Higgins Law, for appellant.

No appearance for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

MOORE, Judge.

### INTRODUCTION

Christopher W. Rowlette appeals from the order of modification entered by the district court for Douglas County in this paternity action between Christopher and Natalie A. Brown. Christopher assigns error to the court's failure to modify the prior award of joint physical custody, its modification of joint legal custody to remove his final decisionmaking authority, and its modification of the parties' parenting time schedule. For the reasons set forth herein, we affirm as modified.

### STATEMENT OF FACTS

The parties were never married. They are the parents of Maycie J. Rowlette, born in 2010. On July 31, 2017, the district court entered a decree of paternity. The court found the parties' agreement with respect to custody, support, parenting time, and other matters to be in

- 1 -

Maycie's best interests, and pursuant to that agreement, awarded the parties joint legal and joint physical custody of Maycie, with Christopher having "final say" in the event the parties could not "reach an agreement regarding fundamental decisions related to the child." The parenting plan provided that Natalie would have regular parenting time every other weekend from 5:30 p.m. Friday until 5:30 p.m. Sunday, and every Tuesday from 5:30 p.m. until Thursday morning when she delivered Maycie to school or daycare. Under this plan, Natalie had 6 overnights with Maycie out of a 14-day period, and Christopher had 8 overnights. The parenting plan also set forth schedules for summer and holiday parenting time. The parties agreed that neither party should pay child support. The court noted that this was a deviation from the Nebraska Child Support Guidelines and was in the child's best interests. At the time of the decree, both parties lived in Omaha, Nebraska.

On May 5, 2021, Christopher filed a complaint to modify the decree. He alleged that material changes in circumstances had occurred since entry of the decree, warranting modification of legal and physical custody, parenting time, and other provisions of the parenting plan. The material changes in circumstances alleged by Christopher included Natalie's move to Lincoln, Nebraska, his marriage in 2018, Maycie's close relationship with her half-sister, ongoing conflict between the parties with respect to Maycie's extracurricular and school activities, Natalie's lack of support or participation in those activities, and Maycie's expressed desire to reside primarily with Christopher. Christopher sought sole legal and primary physical custody, as well as changes in the parenting time schedule and other provisions of the parenting plan. He also sought a modification of child support due to changes in the parties' incomes and the child support guidelines.

Natalie filed an answer and counterclaim (styled as a "Cross-Complaint"), seeking removal of Christopher's final decisionmaking authority, a "2-2-3" parenting time schedule, the adoption of a new parenting plan, and an award of child support and other expenses. Material changes in circumstances since entry of the decree identified by Natalie included Christopher not acting in Maycie's best interests and Christopher continuously disregarding the current parenting plan without first communicating "issues regarding the minor child." Natalie also alleged that the current parenting plan, including Christopher's final decisionmaking authority and the current parenting time schedule, were not in Maycie's best interests, and that changes in the child support guidelines required a recalculation of child support.

A modification trial was held before the district court on April 4, 2023. The court heard testimony from the parties and Maycie, and it received exhibits into evidence including income tax returns for the parties, school attendance and grade records for Maycie, and copies of various text messages exchanged by the parties.

At the time of the decree, Christopher's residence was approximately 6 or 7 minutes from Natalie's by car. The commute from each of the parties' residences to Maycie's school was approximately 10 minutes.

Christopher continued to reside in Douglas County (with an Elkhorn, Nebraska, address) at the time of the modification trial. He married in 2018, and lives with his wife and their daughter (4 years old at the time of trial), at a residence located 2 miles from where Maycie now attends school. Maycie has her own bedroom and a "separate office" where she can study. Christopher testified that many of Maycie's friends from school, church, or other activities live in Omaha in or

near the neighborhood where Christopher lives. Christopher is self-employed doing "finish carpentry," cabinet and furniture building, and "some light remodeling." His work schedule is variable and flexible enough to allow him to attend tournaments and competitions, as well as many practices, for Maycie's extracurricular activities. Christopher's wife is self-employed as well and also has a variable work schedule.

In the spring of 2021, Natalie moved to Lincoln, Nebraska, where she resides with her boyfriend. They live in the basement of a residence owned by the boyfriend's grandparents on the east side of Lincoln. The residence is located on an acreage. The grandparents live on the main floor of the ranch-style house; Maycie also has her own bedroom on the main floor. Natalie's boyfriend "works in concrete." He also runs "the BMX track" in Lincoln. The residence is located about 52 miles from Maycie's current school. Maycie has some friends in Lincoln that she met through BMX bicycle racing.

Since the move, Natalie has continued her employment in Omaha. Natalie works at "Midwest GI" as a medical assistant. On days when Maycie is with her, Natalie works from 7:30 or 7:45 a.m. to 4:00 p.m.; when Maycie is not with her, she goes in "a little bit earlier." Her schedule is not as flexible as Christopher's, which makes it more difficult to take Maycie to activities occurring during her parenting time. Parenting time exchanges, outside of school drop-offs or pick-ups from Christopher's home at the end of Natalie's workday, have been taking place at the outlet malls in Gretna, Nebraska.

At some point, Christopher decided to place Maycie in a private Christian school. At the time of trial, she was receiving "pretty good" grades (some Cs, and some "outstanding, 97, 96 grades"). He pays the tuition and other associated costs (Natalie has purchased some of Maycie's school uniform pieces). According to Christopher, he did discuss the school change with Natalie. He testified that Natalie was concerned about the cost and that she never really agreed or disagreed once he told her he would pay for the cost. According to Natalie, she first found out about the new school from Maycie, Christopher confirmed he had been looking into the school when she inquired by text, he also told her Maycie would have to be accepted into the school first, and part of her concern about the school had been the cost.

There was evidence about Maycie's school day routine when she was with each parent. At Christopher's, Maycie gets up between 6 a.m. and 6:15 (or closer to 6:30 or 6:40 if she is tired). She gets dressed and ready for school, eats breakfast, participates in a family Bible reading and prayer session, and walks the dog if the weather is good. Christopher testified that they try to leave the house by 7:30 or 7:45 a.m. According to Christopher, in 2021, Maycie was more consistent in getting up early and would often exercise for 15 or 20 minutes, but in 2023, she no longer included the exercise session in her morning routine. Maycie's school day ends at 3:10 p.m. (or 1:50 p.m. every other Wednesday). Christopher or his wife picks her up from school during Christopher's parenting time. Christopher testified that Maycie is usually asleep by 9:30 p.m.

At Natalie's residence, Maycie gets out of bed at 6 a.m. On school days, they typically leave the house between 6:30 and 6:45 a.m. Natalie takes Maycie directly to school on Wednesdays; on Thursdays, they typically meet Christopher at a coffee shop in Omaha (about a 45 minute drive from Natalie's residence). According to Natalie, the drive from her residence to Maycie's school takes between 53 and 56 minutes. She typically has Maycie to school by 7:30 a.m. and said that they are never late in arriving. Maycie's grandfather (Natalie's father) picks

Maycie up from school on Wednesdays, and on the "early out days," she spends time at his residence. On the other days he drives Maycie directly to Natalie's workplace where she waits about 20 minutes until Natalie's workday ends. Natalie tries to have Maycie in bed by 9 or 9:30 p.m.

There was evidence about Maycie's school-related and other extracurricular activities. She had recently finished playing basketball; the basketball practice schedule had been variable, sometimes occurring right after school but sometimes in the evenings, with games occurring on Saturday mornings. Maycie did not have any current ongoing activities at the time of trial, but she had previously participated in Taekwondo between approximately February 2016 and 2022 and "BMX racing, bicycle racing" from approximately July 2020 to the fall of 2022. Prior to Natalie's move to Lincoln, Maycie participated in Girl Scouts, but had not continued to do so after the move. Christopher testified that Maycie attends church on the Sundays she is with him and that she has expressed interest in attending a Wednesday night church youth group. He expressed his support for her attending this group.

Maycie's Taekwondo activity had involved attending at least two practices per week, if possible, with testing for new belt ranks every 3-4 months, and a spring and a fall tournament. Maycie had received her black belt in Taekwondo. Maycie did not attend BMX practices that were available in Omaha on Tuesday evenings (during Natalie's parenting time); she did attend practices Wednesday evenings in Lincoln, as well as some Sunday afternoon competitions and "BMX grand nationals." Christopher testified that Maycie did well in the BMX racing, and in approximately May or June 2021, he moved her from a novice to a more experienced league at her request.

The parties have both contributed financially to Maycie's extracurricular activities. Christopher paid various fees associated with Taekwondo. He also paid for Maycie's annual BMX membership and various racing fees, and he purchased one of the bicycles she used for that activity. Natalie purchased a bicycle Maycie used in Lincoln and paid for "race entry fees"; took her to BMX practices in Lincoln and some in Omaha; took her to races in Omaha, Lincoln, and other locations; and attended an award ceremony and some tournaments for Taekwondo. She testified that she was supportive of Maycie's current interest in playing basketball and would support her "in any summer camp or summer off-season conditioning that she may need."

The parties both testified about the effect of Natalie's move to Lincoln on Maycie. According to Christopher, prior to the move, Maycie's attitude was good, she was "very happy, very energetic," she was enjoying her new school, and she was excited about BMX racing, which she had just started. He testified that after the move to Lincoln, Maycie's grades declined; she seemed depressed, anxious, and tired; and she had "a little bit of an attitude about things." He also reported that she tended to fall asleep in the car and had less enthusiasm for participating in sporting activities.

Natalie agreed that Maycie has fallen asleep in the car when being transported between Lincoln and Omaha and sometimes complains of being tired. However, she testified that Maycie is "a growing child, she's tired quite a bit." Natalie also indicated that Maycie had fallen asleep in the car on occasion prior to Natalie's move to Lincoln. Natalie testified that Maycie mentioned being unhappy about the drive when Natalie first moved to Lincoln but that she had not done so "in quite some time."

Maycie's doctors and dentist are located in Omaha. Christopher changed her doctor at some point. When asked why he did so, Christopher testified, "I just considered a pediatrician a specialist. And being that . . . the pediatrician and the former doctor . . . used to work together and communicate together, I thought it was a good thing." Christopher did not remember whether he talked to Natalie about changing Maycie's doctor. He acknowledged that Natalie has objected "[a] little" to the change. He did not recall if he told her why he made the change. Christopher agreed that there have been occasions when he has not told Natalie about dental checkups for Maycie, but he stated that after appointments he has informed Natalie of "the results or anything she needed to know." Natalie agreed that Christopher would typically tell her afterwards when he had taken Maycie to the doctor.

Christopher asked the district court to award him physical custody and expressed concern about the dangers of frequent interstate travel between Lincoln and Omaha. He noted that Maycie has had, and will continue to have, activities in Omaha throughout the year. And, he expressed concern about Maycie driving back and forth regularly between Lincoln and Omaha once she is old enough to drive herself.

Natalie asked the district court to adopt her proposed modified parenting plan, which primarily changed the weekday schedule to give her parenting time with Maycie on Mondays and Tuesdays, Christopher time on Wednesdays and Thursdays, and expanded the alternating weekend schedule from Friday morning through Monday morning. Natalie testified that her proposed schedule would be in Maycie's best interests because it involved "less back and forth time" and would allow Maycie to attend the Wednesday night church group. She testified that she opposed Christopher having primary physical custody because she felt that Maycie "should spend time with both of her parents." Natalie drives a 2018 Subaru Forester and testified that she felt it was a "safe vehicle" to transport Maycie in. She also testified about the precautions she takes in the event of inclement weather, including being prepared to stay in Omaha and sometimes switching days with Christopher.

We have reviewed Maycie's testimony. Maycie testified in the presence of the parties' attorneys, but the parties were not present during her questioning by the court. Maycie was 13 years old at the time of her testimony. She agreed that the current parenting time schedule was "going okay." She testified that she liked her current school and that she would like to continue in that school. She described the living arrangement in Lincoln as "all right" but not "perfect," and she testified that if she could change anything, it would be to "[p]robably just move back to Omaha." She explained further that living in Omaha was "just easier" and that she did not "enjoy the driving, necessarily." She agreed that she loves both of her parents. When asked about BMX racing, she testified that she does not "really ride anymore" and that she was "[k]ind of more into basketball now." Maycie expressed a desire to be able to participate in the Wednesday evening church group in Omaha because she has friends from church and school who do so. She also testified that she would like to be able to attend football and basketball games at her school; she indicated that because she spends part of her time in Lincoln with Natalie, she had only been able to attend two or three football games, although she "went to quite a few basketball games." She mentioned summer activities in Omaha that she would like to be able to participate in, including a strength and conditioning class and a summer basketball league at her school. Finally, she testified that living in both Lincoln and Omaha might make it difficult if she "ever wanted to get a job."

Upon a brief cross-examination by Christopher's attorney, Maycie testified that she did "get super tired from just being exhausted from going back and forth all the time."

On May 11, 2023, the district court entered an order of modification. The court did not find a material change in circumstances warranting a modification of the prior award of joint physical and joint legal custody. The court found that joint physical custody was still in Maycie's best interests; however, it did find a material change in circumstance warranting removal of Christopher's final decisionmaking authority. The court also found a material change in circumstances supporting modification of the parenting time schedule to a "2-2-3 schedule." With respect to the material changes in circumstances supporting these modifications, the court stated:

Amongst others, the [c]ourt finds that there are unanticipated material changes in circumstances that a modification that the joint legal custody decision[]making authority and the parenting time include, [Natalie's] move to the east side of Lincoln, Nebraska; [Maycie] getting older and being more and more involved in school and other extra-curricular activities as well as personal activities; and, [Maycie] being involved in an every Wednesday night religion class that is encouraged by [Christopher]. The [c]ourt finds that this change in the parenting time increases the stability for [Maycie] as well as the parties and actually makes it a simpler and easier routine for the parties. As to the basis for removal of the final decision authority of [Christopher], the [c]ourt finds there was sufficient evidence given at trial that over the past few years [Christopher] has changed doctors as well other important issues in [Maycie's] life without keeping [Natalie] advised in advance. Thus[,] the [c]ourt finds that it is no longer in the best interest of [Maycie] for [Christopher] to have the final decision[]making authority but that both parties should have the normal decision[]making authority as is awarded via a joint legal custody award by this [c]ourt.

As to the modified parenting time schedule, the district court specified that Natalie was to have parenting time from Monday after school (or 5 p.m. if school was not in session) until Wednesday morning at the beginning of school (or 8 a.m. is school was not in session). Christopher was to have parenting time from Wednesday at the beginning of school (or 8 a.m.) until Friday at the beginning of school (or 8 a.m.). The parties were then to alternate the weekends from the beginning of school on Friday (or 8 a.m.) until the beginning of school on Monday (or 8 a.m.). Following a motion to alter or amend filed by Natalie, the court subsequently modified the schedule to address the "gap" left by its May 2023 order to provide that Natalie's weekday parenting time would begin on Monday morning at the start of school (or 8 a.m.). The modified parenting time schedule resulted in each party having 7 overnights with Maycie out of a 14-day period. Both the May 2023 order and the amended modification order provided that each party was to be responsible for dropping Maycie off at school when exercising their parenting time and that the parties were to continue to meet at "the outlet malls" to exchange Maycie when school was not in session as they had been doing for the previous year or two.

The district court did not order child support in the May 2023 order, a deviation from the child support guidelines based on parties' incomes (the court used income of $3,800 for Natalie and $3,400 for Christopher in the worksheet attached to the modified modification order). The court made other findings not relevant to the issues on appeal.

## ASSIGNMENTS OF ERROR

Christopher asserts, restated, that the district court erred in (1) failing to find a material change in circumstances warranting modification of physical custody, (2) finding a material changes in circumstances warranting modification of legal custody to remove of his final decisionmaking authority, and (3) finding a material change in circumstances warranting a modification of the parties' parenting time schedule and that such a modification would be in Maycie's best interests.

## STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion. *State on behalf of Daphnie F. v. Christina C.*, 310 Neb. 638, 967 N.W.2d 690 (2021). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than the other. *Keiser v. Keiser*, 310 Neb. 345, 965 N.W.2d 786 (2021).

## ANALYSIS

*Applicable Legal Principles.*

Before addressing Christopher's arguments in support of each of his assigned errors, we first set out the legal principles applicable to modifications of custody and parenting time.

The Parenting Act defines "[j]oint legal custody" to mean "mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(11) (Cum. Supp. 2022). "Joint physical custody means mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." § 43-2922(12). And, "[p]arenting time" means "communication or time spent between the child and parent or stepparent, the child and a court-appointed guardian, or the child and another family member or members including stepbrothers or stepsisters." § 43-2922(19).

Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child require modification. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). Modifying a custody or parenting time order requires two steps of proof. *Id.* First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. *Id.* Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. *Id.*

Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior

modification, would have persuaded the court to decree differently. *Id.* Proof of a material change in circumstances is the threshold inquiry in a proceeding on a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances. *Id.*

Under the Parenting Act, the requirements for a child's best interests include "[a] parenting arrangement and parenting plan or other court-ordered arrangement which provides for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress for school-age children." Neb. Rev. Stat. § 43-2923(1) (Reissue 2016). Additionally, § 43-2923(6) sets forth a non-exhaustive list of factors to be considered in determining the best interests of a child in regard to custody, including:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. For purposes of this subdivision, abuse and family or household member shall have the meanings prescribed in section 42-903; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. For purposes of this subdivision, the definitions in section 43-2922 shall be used.

The wishes of a child are not controlling in determinations of child custody and the amount of consideration given to such preferences depends on the child's age (usually over 10 years old) and ability to give reasons for that preference. See *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020).

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Rodas v. Franco*, 30 Neb. App. 910, 974 N.W.2d 856 (2022).

*Physical Custody.*

Christopher asserts that the district court erred in failing to find a material change in circumstances warranting modification of physical custody. In support of his argument that physical custody should have been modified, Christopher argues that the court failed to acknowledge Maycie's wishes and the distress that Natalie's move from Omaha to Lincoln caused to Maycie's health and wellbeing. He also cites cases in which moves of various distances by the parties, closer together or farther apart, were considered by the court in determining whether a material change in circumstances had occurred.

First, Christopher cites *Berndt v. Berndt*, 25 Neb. App. 272, 904 N.W.2d 24 (2017), wherein this court found that the trial court erred in failing to find a material change in circumstances sufficient to modify parenting time. In that case, upon the parties' divorce, they were awarded joint legal and physical custody of their minor children, with the children residing primarily with the father, and the mother having parenting time most weekends and extended parenting time during the summer. At the time of the divorce, the father lived on a ranch 36 miles from Gordon, Nebraska; the mother, who was awarded the family home in Gordon, lived in Kimball, Nebraska, but commuted to Gordon for her parenting time; the children were attending a school 11 miles from the father's residence and 30 miles from Gordon. At the time of the modification proceedings, the mother lived in Cheyenne, Wyoming, but also owned a residence in Gordon and continued to exercise most of her parenting time in Gordon; the father continued to live 36 miles from Gordon; one of the children attended school in Gordon and the other attended school in Rushville, Nebraska (that child rode a school bus from Gordon to Rushville). The mother sought a week-on-week-off parenting time schedule. The trial court denied her modification request, finding that the only change in circumstances since entry of the decree was one child's desire to spend more time with the mother and that this factor alone was insufficient to constitute a material change in circumstances. This court disagreed, and concluded that the changes in the children's schools, the location of the parties' homes in relation to the children's schools, and the mother's availability during the week, were all changes that had occurred since entry of the decree. In our de novo review, we also found that such a modification of the parenting time schedule was in the children's best interests.

Next, Christopher cites this court's unpublished memorandum opinion in *State on behalf of Schlautman-Sudik v. Schlautman*, No. A-06-385, 2007 WL 776863 (Neb. App. Mar. 13, 2007). That case originated as an action filed by the State to establish paternity and the father's support obligations with respect to a minor child. The mother was later added as a third party defendant, and she eventually filed pleadings seeking to establish custody and parenting time. At one point, the parents both lived in Omaha and exercised a joint custody arrangement. At the custody trial, they testified that this arrangement no longer worked because of the mother's move to Lincoln. This court affirmed the trial court's award of sole custody to the father.

Finally, Christopher cites *Kenner v. Battershaw*, 24 Neb. App. 58, 879 N.W.2d 409 (2016). In that case, the mother sought to modify the parties' paternity decree and custody arrangement after moving 100 miles away from where the father lived. Prior to the move, the mother lived on a ranch near the town where the father resided. The child resided primarily with the mother, but the father had parenting time 1 full week each month and every other weekend during the school year, and for 6 weeks during the summer. In her modification complaint, the mother sought sole legal and physical custody, and removal of the father's full week of parenting time each month during the school year from the parenting time schedule. The father filed a counterclaim, also seeking custody of the child. The trial court granted custody to the father, finding that the prior parenting plan constituted a joint physical custody plan, and this court affirmed. In addressing whether a material change in circumstances had occurred, we observed that "[w]hile even an out-of-state move does not automatically constitute a change of circumstances, a significant move may be a change of circumstances warranting modification depending upon other evidence." *Kenner v. Battershaw, supra*, 24 Neb. App. at 62, 879 N.W.2d at 413. We determined that the

mother's move 100 miles away from the father made it "impractical to impossible" for the parties to maintain the prior parenting time schedule. *Id.* After finding that a change in custody was also in the child's best interests, we affirmed.

The cases cited by Christopher are distinguishable from the present case. We note that the appeal in *Schlautman-Sudik* was from an original award of custody; it was not a modification proceeding involving the question of whether the mother's move constituted a material change in circumstances. The determination of whether a material change in circumstances sufficient to modify custody or parenting time had occurred in the other two cases was dependent upon the particular facts of those cases and involved more than just a calculation of the distances between the parties' residences. As we noted in *Kenner v. Battershaw, supra*, whether a "significant move" constitutes a material change in circumstances is dependent upon the other evidence presented in the case.

In this case, at the time of the decree, the parties both lived in Omaha, and the commute to Maycie's school from each residence was about 10 minutes. Natalie moved to Lincoln in 2021, but she continues to work in Omaha. The drive to Maycie's school from the Lincoln house takes between 53 and 56 minutes. There was some evidence about Maycie being upset when the move initially occurred, but nothing to indicate significant changes in her health or wellbeing. She has continued to do well in school.

We agree with the district court that Natalie's change in residence, and the resulting increased travel time to school and parenting time exchanges, do not amount to a material change in circumstances sufficient to modify the joint physical custody awarded under the decree. While Maycie was no longer participating in some of the activities she had been prior to the move, such as Taekwondo and BMX racing, the evidence suggests that the cessation of those activities was not the result of Natalie's move, but rather due to Maycie's current preference for basketball. And, while Christopher testified to some changes in Maycie's behavior and attitude, nothing in the record indicated that these changes were necessarily the result of Natalie's move to Lincoln and the resulting schedule changes.

Upon our de novo review, we conclude that Christopher did not meet his burden of proving a material change of circumstances warranting a modification of physical custody. This assignment of error fails.

*Final Decisionmaking Authority.*

Christopher asserts that the district court erred in finding a material change in circumstances warranting modification of legal custody to remove his final decisionmaking authority. Christopher argues that, in removing this authority, the court gave too much weight to his decisions to change Maycie's school and doctor and failed to properly weigh the effect of Natalie's move to Lincoln on Maycie. He argues further that the changes the court relied on in making this modification were "significantly less disruptive acts" than Natalie's move from Omaha to Lincoln. Brief for appellant at 19. Christopher devotes a significant portion of this section of his brief to directly quoting some of the court's questioning of Maycie, arguing that the trial judge had "made up his mind well in advance of hearing all the testimony." *Id*. Christopher has not assigned any error with respect to the court's questioning of Maycie, and we do not find

- 10 -

Christopher's arguments about that issue relevant to the question of whether there was a material change in circumstances sufficient to remove the "final say" awarded to Christopher in the decree.

The joint legal custody provision of the parenting plan attached to the decree required Christopher and Natalie to "exercise mutual authority and responsibility for making fundamental decisions regarding [Maycie's] welfare," "mutually participate in the responsibility of providing the parenting functions necessary for raising [Maycie]," and gave Christopher "the final say" if "the parties cannot reach an agreement regarding fundamental decisions related to [Maycie]." Christopher observes that the parenting plan does not require him to consult with Natalie prior to making appointments or other decisions and does not define the terms "fundamental decisions" and "parenting functions." These terms are, in fact, more clearly defined by the Parenting Act. See § 43-2922(11) (clarifying that parents' mutual authority and responsibility for making mutual fundamental decisions regarding child's welfare, includes choices regarding education and health). See, also, § 43-2922(17) (defining parenting functions).

With respect to her requested modification of legal custody, Natalie testified that she was seeking "true joint legal custody," which she felt would mean that the parties "have to make decisions together." When asked why she thought that this change would be in Maycie's best interests, she expressed her belief that due to her employment in healthcare, "I might know a little bit more than [Christopher] does coming to her healthcare decisions." She testified that Christopher had not informed her until after the fact about certain decisions he made regarding Maycie. Examples cited in her testimony were changing Maycie's school and doctor, and choosing her dentist, as well as not giving Natalie prior notification of appointments for Maycie. Although Natalie agreed that these decisions by Christopher had not been to Maycie's detriment, she expressed a desire to be more involved in the decisions Christopher was making with respect to Maycie. She also indicated that there was "no point" in her exploring "any other adjustments to [Maycie's] life," such as a school in Lincoln, because of Christopher's "final say." To the extent that Christopher's testimony was in conflict with Natalie's on these issues, we consider and give weight to the fact that the trial court heard and observed the witnesses and accepted Natalie's version of the facts rather than Christopher's. See *Keiser v. Keiser*, 310 Neb. 345, 965 N.W.2d 786 (2021).

The evidence shows that Christopher made some unilateral decisions concerning Maycie that arguably should have been mutual decisions and that the "final say" awarded to Christopher in the decree did not end up functioning as an aid to the parties in resolving impasses in their exercise of joint legal custody. Upon our de novo review, we cannot say that the district court abused its discretion in finding a material change in circumstances with respect to this issue and modifying the decree accordingly. The parties retain joint legal custody which places on them a continuing obligation to discuss and attempt to resolve decisions concerning Maycie. This assignment of error fails.

*Parenting Time.*

Christopher asserts that the district court erred in finding a material change in circumstances warranting a modification of the parties' parenting time schedule and that such a modification would be in Maycie's best interests.

The district court found that Natalie's move to the east side of Lincoln, Maycie's increased involvement in extracurricular activities, and her desire to participate in a Wednesday night religion class that was encouraged by Christopher, constituted material changes in circumstances sufficient to warrant a modification of the parenting time schedule. Christopher does not specifically argue that the court erred in making this finding, and in our de novo review, we find that the court did not abuse its discretion in that regard.

Christopher's arguments in support of his third assignment of error focus on the first three best interests factors under § 43-2923(6): the relationship of the child to each parent; the child's desires and wishes when based on sound reasoning; and the general health, welfare, and social behavior of the child. He agrees that the evidence shows Maycie has a good relationship with both parents. He notes Maycie's testimony about wanting to live in Omaha and argues that her reasons were reasonable and mature. He argues that since Natalie's move to Lincoln, Maycie has been depressed, anxious, and tired. These arguments are more relevant to the issue of physical custody which we resolved above, however, we now review whether the modification of parenting time was in Maycie's best interests. And while we consider the wishes expressed by Maycie, her wishes are not controlling and are but one factor to consider in the best interests analysis. See *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020).

The modified schedule adopted by the district court shifted the parenting time exchanges from the evening to the morning, added one day to the alternating weekend parenting time, expanded Natalie's weekday parenting time to 2 full days, and also shifted her weekday parenting time to the beginning of the week, rather than midweek, in order to allow Maycie to attend the Wednesday night religion class. The court found that this change "increases the stability" for Maycie and the parties, making "a simpler and easier routine."

In our de novo review of the record, we disagree that the modified schedule increases stability for Maycie. Following Natalie's move to Lincoln, the parenting time provided for in the decree resulted in Maycie having to make 10 trips between Omaha and Lincoln during every 14-day period, without considering any additional trips required by extracurricular activities. The modified schedule adopted by the court also required 10 such trips during every 14-day period, at a minimum. Thus, the parenting time exchanges remained the same. However, the modified schedule also increased Natalie's overnights from 6 to 7 every 14 days, which does not make for an easier routine, when considering Maycie's wishes and other evidence.

While the difficulty of transitioning between Omaha and Lincoln will remain as a result of Natalie's move to Lincoln, we find that it is not in Maycie's best interests to increase Natalie's overnight parenting time. We do agree with the district court's modification to allow Maycie to be in Omaha on Wednesday evenings, which both parties agreed was appropriate. We therefore modify the court's order to continue Natalie's 6 overnights during a 14-day period as follows: During the first week of a 2-week period, Natalie will have parenting time from Saturday morning at 10 a.m. to Wednesday morning at the beginning of school. During the second week, Natalie will have parenting time from Monday at the beginning of school until Wednesday morning at the beginning of school. This gives Natalie 6 overnights. Christopher will have the remaining parenting time, which amounts to 8 overnights. Any mornings when school is not in session, parenting time will start at 8 a.m. or as the parties may otherwise agree. All other provisions of the amended modification order remain the same.

CONCLUSION

The district court did not abuse its discretion in declining to modify physical custody, or in modifying legal custody to remove Christopher's final decisionmaking authority. However, we find the court did abuse its discretion in its modification of parenting time and we modify the parenting time schedule as set forth above.

AFFIRMED AS MODIFIED.