IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
**(Memorandum Web Opinion)**

STATE ON BEHALF OF ASHER H. V. NATHAN H.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA ON BEHALF OF ASHER H., A MINOR CHILD, APPELLEE,

V.

NATHAN H., APPELLANT, AND STACY S., APPELLEE.

Filed February 18, 2025.    No. A-24-142.

Appeal from the District Court for Lancaster County: RYAN S. POST, Judge. Affirmed.

Trevin H. Preble, of Preble Law Firm, P.C., L.L.O., for appellant.

Laura A. Lowe for appellee Stacy S.

MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

The Lancaster County District Court approved a stipulated agreement between Nathan H. and Stacy S. and ordered that they were to have joint legal custody of their son, Asher H., with Stacy having primary physical custody. Years later, Nathan filed a complaint to modify seeking legal and physical custody of Asher. He alleged that Asher's well-being was "placed in jeopardy" while in Stacy's care. The district court denied Nathan's request to modify custody, but it did modify the parties' parenting plan. On appeal, Nathan challenges the court's finding that no material change in circumstances existed that would require a change in custody. Finding no abuse of discretion, we affirm.

## II. BACKGROUND

Nathan and Stacy were never married, but are the parents of Asher, born in 2013. Nathan is now married to Amber H., and lives in Yankton, South Dakota. Stacy is now married to Cole

- 1 -

M., and lives in Kearney, Nebraska. Nathan's allegations in support of a material change in circumstances relate to Cole's behaviors towards Stacy.

Stacy and Cole were first in a romantic relationship from 2008 to 2010, during which time they had a child in 2009. There is no dispute that Cole was abusive to Stacy during that earlier relationship, that she had filed petitions and affidavits for domestic abuse protection orders against Cole, and that Cole went to prison after being convicted of assaulting her. Stacy later entered a relationship with Nathan, and they had Asher in 2013; after that relationship ended, a custody order was entered in 2016. Stacy subsequently resumed a romantic relationship with Cole in 2019, they had another child in 2020, and they married in 2022. Additional facts will be discussed as necessary later in this opinion.

### 1. 2016 ORDER REGARDING PATERNITY, CUSTODY, AND SUPPORT

On April 25, 2016, the district court entered an order approving and incorporating Nathan and Stacy's "Stipulation Regarding Paternity, Custody and Support" and "Parenting Plan." Nathan and Stacy were awarded joint legal custody of Asher, with Stacy having primary physical custody. Nathan was to have parenting time with Asher every other weekend from Friday at 4 p.m. until Sunday at 6 p.m.; holiday parenting time was also established. For the summers of 2016 and 2017, the parents were to alternate parenting time on a weekly basis, with transitions to occur on Sundays at 6 p.m. For the summer of 2018 and every summer thereafter, Nathan was to have Asher for 8 consecutive weeks, with Stacy having parenting time on the 2nd, 4th, and 6th weekends from Friday at 4 p.m. until Sunday at 6 p.m. The court also ordered Nathan to pay monthly child support.

It appears that at the time of the April 2016 order, Nathan lived in St. Helena, Nebraska. Nathan subsequently moved to Yankton, approximately 2 miles from the Nebraska border. Stacy moved to Kearney in April 2020.

### 2. MODIFICATION ACTION

### (a) Complaint to Modify Custody

On July 27, 2023, Nathan filed a complaint to modify the 2016 order, alleging there had been a material change in circumstances in that: "[i]t is not in the best interests of the minor child to be in the physical custody of [Stacy]"; "[t]he minor child's well being is being placed in jeopardy while in the care of [Stacy]"; and "[Stacy] has made personal decisions regarding her place of abode which place the minor child in jeopardy." Nathan sought legal and physical custody of Asher, "which allows the minor child to reside in South Dakota."

Also on July 27, 2023, Nathan filed an ex parte motion for legal and physical custody. The district court issued an ex parte order that same day and granted Nathan immediate temporary legal and physical custody of Asher until further order of the court; a hearing on the matter was set for August 2. Following the August 2 evidentiary hearing, the court vacated the ex parte order. On November 21, Nathan filed a motion for temporary custody, but the court denied the motion at a hearing on November 27; the trial had already been set for January 2024.

### (b) Trial

Trial was held on January 24 and 25, 2024. Several witnesses were called to testify, and numerous exhibits were received into evidence.

Stacy (37 years old at trial) testified that she was a licensed practical nurse and a certified dementia practitioner. She was currently working with children with complex medical needs and worked between 12 and 16 hours per week and "picks up as many shifts as [she] can." She lived in Kearney with her husband Cole, their youngest daughter (3 years old at trial), and Asher (10 years old at trial); Stacy and Cole's oldest daughter (14 years old at trial) lived in an agency home with "24/7" care due to her medical needs. According to Stacy, Asher and his younger sister were "inseparable." And Asher and Cole had a "really good relationship" and did "a lot together," like going bowling and playing basketball.

Cole (39 years old at trial) was self-employed and owned a painting company. He said that Asher was "a great kid" and Cole "love[d] being around him." They went bowling together, and Cole helped with Asher's basketball team. Cole said he also tried to teach Asher "how to be polite," "how to shake a man's hand," and "how to open doors" for others.

Nathan (39 years old at trial) testified that he had been a full-time, self-employed farmer for approximately 3 years. He lived in Yankton with his wife, his older son (17 years old at trial), and two of his wife's children (17 and 12 years old at trial). He had parenting time with Asher every other weekend, every other holiday, and 2 months during the summer "where he still goes back every other weekend." Asher was a "happy-go-lucky kid," "[p]retty active," "pretty loving," and had a "[b]ig heart." When in South Dakota, Asher played baseball, took swimming lessons, and participated in boys and girls club. Asher liked going fishing and boating, going to his grandparent's house, and farming with Nathan.

Nathan's wife Amber was a registered nurse. She said that Nathan and Asher had "a very good relationship." Nathan was "very involved and devoted to [Asher's] needs and his future," especially when it was his "time with us." When Asher was in South Dakota for the summer, Nathan loved doing activities with him and coached his baseball team. Amber said Asher was "a good kid" and "[v]ery helpful around the house." He "[l]oves to spend time with anybody that will spend time with him at home" and he "loves to be involved with anything, going out doing things, games at home, Xbox, phone, sports." Asher and the other children in the home got along "[p]retty well."

Stacy testified that she has always been Asher's custodial parent. She took him to all his doctor appointments and was involved in his schooling. Nathan confirmed that he had not been involved in Asher's medical care and he did know the name of Asher's doctor. He had not attended parent-teacher conferences or been in touch with Asher's school the past couple of years and he did not know the name of Asher's teacher. Nathan also did not give Asher his ADHD medication because "when he's with us we have no need . . . for him to be on that."

Nathan stated that Stacy was a "caring mother," and Asher had "done well" in her care. However, Nathan filed the complaint to modify custody out of "concern for Asher's safety" because Stacy's husband, Cole, had a "history of aggression, and abuse, and drug abuse." Nathan believed that it was in Asher's best interest to be placed in his custody in South Dakota.

Stacy said she had known Cole for close to 20 years, and he had assaulted her in the past. When asked if Cole ever harmed Asher, or if Asher ever expressed any fear of Cole, Stacy replied, "No." Stacy believed that she had the ability to protect Asher. She confirmed that she knew to seek help if there was a problem, and she had done so in the past. Stacy did not believe it would be in Asher's best interest to change custody because "change would be really hard on [Asher]."

*(i) Before Parties' 2016 Custody Order*

According to Nathan, prior to his relationship with Stacy, Stacy and Cole had been in a "physical altercation where her teeth were kicked in," there "might've been some drug use involved," and Cole "went to prison for it."

Stacy said that she and Cole were previously in a romantic relationship from the end of 2008 until sometime in 2010. From 2010 to 2012, Stacy filed three petitions and affidavits for domestic abuse protection orders against Cole; those petitions and affidavits were received into evidence in this case. In her January 2010 petition and affidavit to obtain a domestic abuse protection order, Stacy claimed that when she was 6 months pregnant, Cole strangled her and left marks on her neck, threw a phone at her breaking it on her back, and left bruises on her arm and back; after their child was born Cole "beat [Stacy] up" three times, twice while he was holding the child; after the child was born he also got mad and punched a hole in the wall, threw various items at the wall and threw three cells phones at Stacy, damaged her car, and threatened her and her family. In her November 2010 petition and affidavit to obtain a domestic abuse protection order, Stacy claimed that in July of that year Cole punched her in the face multiple times and knocked her teeth out and later threatened to kill himself with a pistol he grabbed out of a nightstand; and she claimed that in March of that year he grabbed her by the hair, pinned her up by a building, and shoved her head into the door several times. In her March 2012 petition and affidavit to obtain a domestic abuse protection order, Stacy claimed that Cole sent her threatening letters from prison.

*(ii) After Parties' 2016 Custody Order*

Stacy and Cole entered a romantic relationship again in the middle of 2019. Nathan "had an assumption" that Stacy was dating Cole again when she moved to Kearney in 2020. Stacy and Cole subsequently married in April 2022. According to Nathan, he learned about other assaults after they occurred.

Nathan confirmed that in May 2022, he initiated a modification action to obtain custody of his older son who had been living with him. Nathan also communicated his concern about Asher to his attorney, and his attorney "was able to look into it." In June 2022, Nathan sent Stacy a text message asking what happened on May 26, 2021; it was Nathan's understanding that Cole abused Stacy. Stacy "just made it sound like it was not a big deal." But Nathan had since learned that Stacy did not tell him everything that happened. In July 2023, Nathan filed a complaint to modify custody, and at that same time filed an ex parte motion for temporary custody of Asher. In his affidavit for ex parte custody of Asher, Nathan stated, "In the last two weeks I found out that [Stacy] had been assaulted by her husband, Cole . . . Cole . . . was found guilty of assaulting [her] on September 9, 2022 . . . He was placed on probation." (Emphasis omitted.) When asked if in his affidavit he was referring to the incident that occurred in May 2021, Nathan responded, "I'm not sure. There's been a few incidences, so. Might've been an additional one. I'm not sure." "It was over several contacts with [my attorney], . . . I would find out more and more, even with the times [Cole's] broken his -- within the last year -- his probation or whatever he's on . . . that some of those I never knew about." Nathan continued to find out information throughout the discovery process in this case. Nathan confirmed that he had read a lot of reports and the things that happened to Stacy and others blended together. Nathan stated, "I have a hard time remembering what happened to who and when that happened." However, the repeated assaults that took place caused

- 4 -

him concern. "I counted once, when it was all pulled up and there was, like five different incidences of strangulation or something like that," of those incidents "I don't remember how many were Stacy."

Nathan's biggest concern was "that Asher could be around that kind of assault." Nathan was not sure if Asher was present when Stacy was assaulted, but "believe[d] there was one incident" when Cole "was aggressive and angry," and Asher was in the household, and there was a "door broken, mirrors broken, holes in the walls"; Nathan could not remember when that incident occurred.

According to Stacy, since she and Cole got back together in 2019, law enforcement had been to their home in August 2020, May 2021, and February 2023, but she had not felt like she had to file for any protection orders.

a. August 2020

Law enforcement came to Stacy's home on August 6, 2020, after Stacy asked her neighbor to call the police. In a police report from August 6, the officer wrote:

[S]tacy stated that Cole . . . had been angry about missing his meeting with his pastor . . . and had yelled at her that it was her fault that she didn't set her alarm. She told me that he got up and began to "destroy" the house. She told me that he had tipped over the couch[,] punched holes in the wall, broke a mirror and a bathroom door. . . . She also told me that he is using methamphetamine again. She stated that he had been yelling at her and had made a statement that he was not going to put hands on her but she was still scared of him because he's done so in the past. She told me he had thrown a peach at her but it had missed her. She stated that he then left.

During her testimony, Stacy remembered telling the officer that Cole was upset because he missed a meeting with their pastor. If Stacy told law enforcement that Cole was using methamphetamines, she "said it under suspicion," because she had never seen Cole use drugs, but he told her he had used methamphetamines when he was younger. "And so, when he was displaying the erratic behavior, I was trying to pinpoint what could have been causing it"; that is why she would have said something about him using methamphetamines again, "out of suspicion."

Deposition testimony from another officer was received into evidence, including the officer's body camera video. According to the deposition, the officer responded to a call for service on August 7, 2020. The body camera video shows that the officer went to Cole's residence regarding a misdemeanor vandalism/criminal mischief and trespassing at a job site. When the officer spoke to Cole, Cole said he "was struggling," felt like he was "having a breakdown," and was "losing it in [his] head." When the officer asked if Cole had been "using" again, Cole responded, "Yeah," but "not in the last week." Cole wanted to go to the hospital and was going to be taken by a friend. In his deposition, the officer stated he spoke to Cole's brother that day, and the brother stated that Cole had been self-medicating with methamphetamine (the brother's alleged statement is not heard on the body camera video; but the recording had been muted for a while at the brother's request). In the body camera video, Cole's brother can be heard telling the officer that they had to take Asher to his dad's house in Yankton "yesterday" "just to get him out of the house." Stacy testified that Asher was not at her home on August 6 because he was with Nathan,

so she did not know why her brother-in-law would have told law enforcement that they had to get Asher out of there. According to Stacy, Cole tried to check himself into a hospital after the August incident, but "they didn't feel like he was . . . erratic enough to be admitted anywhere"; "[t]hey did do urinalysis," and "his urine was negative for anything." Stacy could not recall if she told Nathan about the August incident.

### b. May 2021

On May 26, 2021, Cole assaulted Stacy in their home. (According to an exhibit, Cole was upset because three employees did not show up for work that morning and he called and told Stacy he did not want anyone at the house when he got home; she was not gone when he got home.) Stacy said, "[h]e grabbed me with one hand on the front of the neck, and then with the other hand, on the side of my neck"--he "wasn't . . . choking me," "[h]e was more so getting my attention"--and was "screaming at me in my ear." She had red marks on her neck from that assault. During this incident, their daughter (almost 8 months old at the time) was asleep in her room, and Asher was with Nathan. Stacy went to the police station and spoke with an officer that day. Stacy answered in the affirmative when asked if Cole was arrested for domestic assault and if a "no contact" order was put in place. Two days later, Stacy asked the court to drop the no contact order. According to Stacy, Asher did not know anything about the May 26 incident. Stacy could not recall if she told Nathan about the incident, Cole's charge, or his sentence. According to an exhibit, on September 9, 2022, Cole was sentenced to 2 years' probation for his conviction on one count of third degree assault, a class I misdemeanor.

### c. February 2023

On February 25, 2023, Stacy called law enforcement to have Cole removed from their residence. (A recording of that call was received into evidence and reveals that Stacy called to find out if an officer could come and ask Cole to leave the home because he was upset and had thrown a ladder at the vehicle she was in; she stated that she did not want Cole to get in trouble and he would not cause any problems for the officer, she just wanted him to leave the house.) At trial, when asked if Cole threw a ladder at her that day, Stacy responded, "He threw a ladder"; "Asher and I were in the vehicle, we were actually leaving to go somewhere" and "because it was thrown in my direction, it appeared to me like it was being thrown at me," but "I don't know what [Cole's] intention was." (Cole testified that he tossed the ladder into the grass next to his truck, but "[y]ou could say it was towards her direction, yes." "I was frustrated, and I threw it by my truck to take it with me.") Stacy was asked why Cole needed to be removed from the house if she was leaving. She responded, "Because I wanted to be able to be there with the kids" and "[s]ometimes I just like to be able to have my own space." Stacy did not know if Asher saw the ladder being thrown, but he never asked her anything about it. Stacy "assume[d]" Asher saw the officer, but he did not have any contact with the officer; Asher was in the vehicle when she spoke to the officer outside of the vehicle.

### (iii) Testimony About Cole's Past and His Progress

Cole testified that he had been incarcerated more than 10 times and had "been in trouble pretty much a lot of my life." He had assaulted Stacy "[t]oo many" times since he had known her.

- 6 -

He said he previously served 22 months in prison for domestic assault against Stacy; he also served 18 months for violating his parole. "The last time I got out of prison was April 20th, probably nine years ago, I believe." Cole answered in the affirmative when asked if he was then found guilty of assault and strangulation of an ex-girlfriend in 2016; he received 5 years' probation. Cole said he stopped taking steroids in 2016 after the assault on his ex-girlfriend, and "it's definitely helped me," and "keeps me more levelheaded."

Cole was currently on probation for the third-degree assault of Stacy (May 2021 incident). He said that since being placed on probation, he received two sanctions in 2023 for "failing UAs"--one time he tested positive for cocaine and the other time he failed the 80-hour alcohol test. When asked how long his sanctions were, Cole responded, "I did two days in jail." Stacy said that Cole served his March and April 2023 sanctions on weekends when Asher was with Nathan; she did not recall if she told Nathan about Cole's probation sanctions.

Cole stated that for probation he completed a substance abuse evaluation, went to medication management, participated in random drug and alcohol testing, completed a 36-week batterers' intervention program and other classes, and had 2 or 3 weeks left of his "moral recognizance class" or "MRT is what I call it."

Cole testified that when he was a kid, he used to get picked on and after a while he dealt with it by "beating people up." He "never knew how to separate [his] emotional reaction from [his] physical reaction," and "over the years, [he] never got the help to separate that" and he "just reacted violently." He started going to individual counseling, and he and Stacy participated in couples' counseling. Through counseling he was able to identify his triggers. "[N]o matter what you do, life is going to be tough," but Cole "realize[d] that when I come home with a positive attitude, everybody is happy." "Now it's like I'm thankful for my life." Cole said that he and Stacy "don't fight like we used to." "[W]e've had a ton of growth in the last year."

Stacy testified that "it has taken [Cole] some time to get to be the person that he needed to be." Cole "is a very loving and caring person" and "would give his shirt off his back to anybody." "[H]e has been doing better in his willingness to and his wanting to do better. And I've seen the growth he's made." Stacy and Cole attended church every Sunday and took classes together at church; "I feel like God has helped us the most through everything." They attended therapy together and Cole continued to go to therapy. She felt like their relationship was improving and that they were getting better at communicating.

Brad Brandt is a self-employed general contractor. He had also been a church deacon for 7 years, had led a "biblically based" recovery group for the past 20 years, had been a life coach for the past 21 years, and taught "some biblical classes through [the] church as well." Brandt testified that he met Cole "seven, eight years ago at a recovery meeting," he met Stacy about 5 years ago, and he was their landlord. When Brandt first met Cole, Cole was "a wreck." Brandt "could tell that [Cole] had some relational and behavioral problems that had been carried through life" "[a]nd that had never really been dealt with."

Brandt stated that Cole reached out to him "about three years ago" and asked for help because Cole "realized that the way he was doing life was pretty ineffective" and "was destructive." They "[s]tarted going deep with him with regards to emotional wounds, issues of the past, and how to work through those." Brandt sent Cole "quite a bit of material with regards to what an authentic man looks like," "[a]nd with that, comes the title of husband and father as well."

Brandt said that "it's been baby steps with Cole," but "the past year, he's really jumped into it hard," "[h]e's been absorbing a lot of the messages at church" and "I see him applying those when I encounter him." Brandt saw a "definite character change" in Cole and he was now a "[c]ompletely different person" than when they first met. "The biggest change I see is that he's humble," "[w]hereas before he was a prideful man" and "[h]e lived in a state of denial and blame for others." "[S]ome of the things that I wanted him to know is that a true man will accept responsibility for the choices that he's making." "[T]he biggest character change that I've noticed in Cole is that humility and willingness to become a better man, husband, and father." "I'm at the point where I would trust him with my kids, and even my life."

Brandt had not had the opportunity to observe Cole and Stacy together in private, but had observed them in public, specifically at church services every Sunday. Brandt said that he saw "some peace in their relationship" now, whereas a few years ago he "could sense a wall between them." In Brandt's opinion, "Cole and Stacy are closer today than they've ever been."

On cross-examination, Brandt said he knew that Cole had issues with drug and alcohol dependency in the past and believed that he was "striving to abstain from those substances." Brandt did not know "a lot" about Cole's criminal history, but knew he was on probation and that there had been a "protective order." Brandt was not aware of any physical injuries that Cole ever caused Stacy.

Scott S., Stacy's father, is an emergency operation planning specialist and works for schools across Nebraska. He had previously been employed by Behavioral Health Region V Systems working on "protective factors and risk factors" with children in the community; had been the executive director of substance and alcohol abuse prevention for four counties, including 14 school districts and two college campuses; and had spent 25 years with the Nuckolls County Sheriff's Office.

Scott has known Cole since Cole was a teenager and Scott was in law enforcement. Scott was aware that Cole went to prison for assaulting Stacy and that she had filed protection orders against Cole. When asked how he felt about Cole and Stacy later rekindling their relationship, Scott replied, "I don't know that I was ever happy with that, but the fact was that I saw some changes in Cole that were tremendously different than what I had seen prior to that," "they were working on things." "I've seen a lot of changes . . . with this [sic] faith-based things, the counseling, the treatments, the rehabilitation that Cole goes through. Is he perfect? No[,] but none of us are." Scott confirmed that he was aware of the incidents that occurred in August 2020, May 2021, and February 2023, and he was aware that Cole was on probation for assaulting Stacy. Scott stated that Cole's "violence has changed" and Scott was not aware of anything in "the last couple years."

Scott testified that he can tell when things are bothering Asher; Scott "always had that knack" with his children and grandchildren, and "being a former officer, I still have that ability." Scott believed that Asher would openly talk to him about any concerns he had about his living situation; Asher never approached Scott about Cole.

(c) District Court's Order

The district court entered its modification order on February 6, 2024. The court found that there had not been a material change in circumstances to modify custody since the entry of the April 25, 2016, order regarding paternity, custody, and support. The court stated,

The bulk of the incidents between [Stacy] and Cole . . . occurred prior to the 2016 Order. Of course, other incidents that have occurred since that order are concerning, but the Court does not find that evidence shows the custodial parent is unfit or that the best interests of the child require a change in custody. No evidence was presented that the child has ever been harmed by Cole . . . and the child has never expressed a fear of him. The Court finds it significant that [Cole] has made improvements over the last year, continues to participate in counseling, and joins [Stacy] in couples counseling.

The court found that the evidence showed that Asher was happy, healthy, and doing well in school, and that he enjoyed school and activities. "Despite the history of conflict between [Stacy] and [Cole], the Court cannot find it is in the child's best interest to change custody."

That said, the district court did find that there had been a material and substantial change in circumstances to modify the parenting plan and that it was in the child's best interests to do so. The court stated,

The evidence at trial showed communication between the parties about incidents in the home could improve, that access to substances should be limited, and that counseling is beneficial. While the Court understands [Nathan's] concerns about [Cole], the Court finds they can be addressed with modifications to the parenting plan. To be clear, this conclusion is based on the evidence at trial, including the evidence that the child is currently safe in [Stacy's] home and [Cole's] current participation in counseling.

The court ordered that the parties continue to have joint legal custody of Asher, with Stacy having primary physical custody. However, the court ordered that the parenting plan be modified as follows:

a. Neither parent shall allow the child to be under the supervision of any adult who is intoxicated on alcohol or under the influence of any mind or mood-altering substances, including marijuana, except as prescribed by a physician. No steroids or controlled substances, including marijuana, shall be present in the home of either parent except as prescribed by a physician.

b. If Cole . . . discontinues his current counseling or therapy, [Stacy] shall notify [Nathan] within 24 hours of the discontinuation.

c. If Cole . . . is placed in custody by law enforcement for any reason, [Stacy] shall notify [Nathan] within 2 hours of Cole . . . being placed in custody, notify [Nathan] if the child was present for any related incident, and allow [Nathan] to come pick up the child.

All provisions of the prior orders which were not specifically modified by this order were to remain in full force and effect.

Nathan appeals.

### III. ASSIGNMENT OF ERROR

Nathan assigns that the district court erred in finding that no material change in circumstances existed that would require a change in custody of the minor child and allow said child to be removed to the state of South Dakota.

## IV. STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion. *Mann v. Mann*, 316 Neb. 910, 7 N.W.3d 845 (2024).

## V. ANALYSIS

### 1. GENERAL PROPOSITIONS OF LAW

Ordinarily, custody and parenting time of a minor child will not be modified unless there has been a material change in circumstances showing that the best interests of the child require modification. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021). Modifying a custody or parenting time order requires two steps of proof. *Id*. First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. *Id*. Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. *Id*.

A material change in circumstances is the occurrence of something which, had it been known to the court at the time of the initial decree, would have persuaded the court to decree differently. See *id*. Proof of a material change in circumstances is the threshold inquiry in a proceeding on a complaint to modify, because issues determined in the prior custody order are deemed preclusive in the absence of proof of new facts and circumstances. *Id*.

When a change in custody is to be made, it should appear to the court that the material change in circumstances is more or less permanent or continuous and not merely transitory or temporary. *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). The rationale for limiting modifications of custody and parenting time to only those necessitated by a material change in circumstances is to avoid extensive and repetitive litigation and unnecessary, potentially harmful fluctuations in the child's life. *Lindblad v. Lindblad, supra*. Simply put, a custody or parenting time order will not be modified absent proof of new facts and circumstances arising since the order was entered that affect the best interests of the child. *Id*.

When determining the best interests of the child in the context of custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. *Jones v. Jones, supra*. Other relevant considerations include stability in the child's routine, minimalization of contact and conflict between the parents, and the general nature and health of the individual child. *Id*. No single factor is determinative, and different factors may weigh more heavily in the court's analysis, depending on the evidence presented in each case. *Id*. The one constant is that the child's best interests are always the standard by which any custody or parenting time determination is made. *Id*.

## 2. DISTRICT COURT DID NOT ABUSE ITS DISCRETION

Nathan claims that the district court erred in finding that there had not been a material change in circumstances necessitating a change in custody. He argues that a material change in circumstances existed because "Stacy once again entered into a relationship with Cole, . . . her serial abuser, . . . after the 2016 order[,]" and that it was "unfathomable to believe that any Court would award Stacy custody had they known she would once again take up with her serial abuser." Brief for appellant at 10. He contends, "the continued abuse in and of itself since 2016 is enough to warrant a material change in circumstances." *Id.* Nathan further argues that "[w]hile there is no direct evidence that Asher has been abused himself, that is not the standard." *Id.* at 11. He claims that while Asher may not have "seen the destruction take place," he "saw the aftermath and lived through it," and Stacy "[p]utting her son in danger makes [her] an unfit mother." *Id.* "Living in that home is clearly not in Asher's best interests." *Id.* Nathan states that "the evidence is clear that [he] is an excellent father and that he can provide Asher with a loving, stable home." *Id.*

In response, Stacy argues that "Nathan did not show that [she] was an unfit parent; nor did he demonstrate that there was a material change in circumstances necessitating a change in custody." Brief for appellee at 15. Nathan "focused a lot of emphasis and time on the incidents of violence and abuse Stacy endured at the hands of Cole in their prior relationship in 2008 to 2010," which occurred before the parties' 2016 "baseline" order. *Id.* Nathan "had this baseline knowledge when, late 2019 or early 2020, he learned that Stacy had moved to Kearney and was rekindling a relationship with Cole," "[y]et he did nothing." *Id.* "The record in this case is completely devoid of any occasion prior to June 24, 2022, in which Nathan expressed [any] concern whatsoever about Stacy's relationship with Cole or her living arrangements," *id.*, and "he waited a full 13 months to file his action seeking to modify custody," *id.* at 17.

Keeping in mind that a prior custody or parenting time order will not be modified absent proof of new facts and circumstances that affect the child's best interests, see *Lindblad v. Lindblad, supra*, we note the following. Since the 2016 order, Stacy resumed a relationship with Cole, had another child with him, married him, and had ongoing domestic violence issues with him. There is certainly merit to Nathan's argument that these occurrences may constitute a material change in circumstances since the 2016 order. However, the material change in circumstances must also affect the best interests of the child. And on this record, we cannot say that the district court abused its discretion in finding there was no material change in circumstances that impacted the best interests of Asher to the extent that a change in custody was warranted.

As noted by the district court, there have certainly been some concerning incidents since the 2016 order. Of note is the property damage that Cole caused in August 2020 when he was upset, and a May 2021 incident when Cole placed his hands on Stacy's throat and yelled at her; the latter incident resulted in Cole being sentenced to 2 years' probation. However, based on the record before us, it appears that Asher was not present for either the August 2020 or May 2021 incidents, and there was no evidence that he was even aware that the incidents occurred. There was also no evidence that he was affected by either of the incidents.

The one incident where Asher was present occurred in February 2023. Stacy testified that she called the nonemergency police number to have Cole removed from their residence after he tossed or threw a ladder when she and Asher were leaving in a vehicle. Stacy did not know if Asher

saw the ladder being thrown, but he never asked her anything about it. Asher may have seen, but did not have any contact with, the officer; Asher was in the vehicle when Stacy spoke to the officer outside of the vehicle. Again, there was no evidence that Asher was affected by the February 2023 incident.

The record shows that Cole has made efforts to improve his behavior, particularly in the year leading up to trial in January 2024. Cole stated that during his current probation for the May 2021 incident, he completed a substance abuse evaluation, went to medication management, participated in random drug and alcohol testing, completed a 36-week batterers' intervention program and other classes, and had 2 or 3 weeks left of his "moral recognizance class" or "MRT." Cole stated that he also started going to individual counseling, and he and Stacy participated in couples' counseling. Through counseling he was able to identify his "triggers." Cole said that he and Stacy "don't fight like we used to." "[W]e've had a ton of growth in the last year." Both the church deacon and Stacy's father testified that they had seen improvements in Cole.

By all accounts, Asher is "a great kid," is healthy, and does well in school. This suggests there has been positive parenting from both parents, both while Asher has been in Stacy's primary physical custody and during Nathan's parenting time. While there is no doubt that Nathan is a loving father and could provide a stable home for Asher, even he testified that Stacy was a "caring mother," and that Asher had "done well" in her care. There is no evidence that Cole has ever harmed Asher. And while it is concerning that Cole has been abusive towards Stacy, most of the abuse occurred years before Asher was born. Asher was not present for the more recent incidents and was not aware of them, and importantly, there was no evidence that he was adversely affected by the incidents. Furthermore, the district court found it "significant" that Cole had "made improvements over the last year"; the record supports that finding. To address any concerns about Cole's behavior in the future, the court appropriately modified the parties' parenting plan to prohibit Asher from being under the supervision of any adult who is intoxicated or under the influence of alcohol or any mind or mood-altering drugs, except as prescribed by a physician. Additionally, Nathan is to be notified if Cole discontinues his counseling or is placed in custody by law enforcement for any reason, and if Asher was present for any related incident, Nathan was authorized to "come pick [him] up."

Based on our review of the record, the district court did not abuse its discretion when it found that Stacy was not unfit and that it was not in Asher's best interests to change custody.

## VI. CONCLUSION

For the reasons stated above, we affirm the district court's February 6, 2024, order modifying the parties' parenting plan, but not changing custody.

AFFIRMED.